BABBITT, SECRETARY OF THE INTERIOR, ET AL.
*v.* YOUPEE ET AL.

No. 95–1595.   Argued December 2, 1996—Decided January 21, 1997

*James A. Feldman* argued the cause for petitioners. With him on the briefs were *Acting Solicitor General Dellinger, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Anne S. Almy, Robert L. Klarquist,* and *Andrew C. Mergen.*

*Rene A. Martell* argued the cause for respondents. With him on the brief were *Daniel L. Minnis* and *D. Michael Eakin.**

JUSTICE GINSBURG delivered the opinion of the Court.

In this case, we consider for a second time the constitutionality of an escheat-to-tribe provision of the Indian Land Consolidation Act (ILCA). 96 Stat. 2519, as amended, 25 U. S. C. § 2206. Specifically, we address § 207 of the ILCA, as amended in 1984. Congress enacted the original provi-

---

*Briefs of *amici curiae* urging affirmance were filed for the Allottees Association and Affiliated Tribes and Bands of the Quinault Reservation et al. by *Joel Jasperse* and *Thomas E. Luebben;* and for the Pacific Legal Foundation by *James S. Burling.*

sion in 1983 to ameliorate the extreme fractionation problem attending a century-old allotment policy that yielded multiple ownership of single parcels of Indian land. Pub. L. 97–459, § 207, 96 Stat. 2519. Amended § 207 provides that certain small interests in Indian lands will transfer—or "escheat"—to the tribe upon the death of the owner of the interest. Pub. L. 98–608, 98 Stat. 3173. In *Hodel* v. *Irving*, 481 U. S. 704 (1987), this Court held that the original version of § 207 of the ILCA effected a taking of private property without just compensation, in violation of the Fifth Amendment to the United States Constitution. *Id.*, at 716–718. We now hold that amended § 207 does not cure the constitutional deficiency this Court identified in the original version of § 207.

I

In the late Nineteenth Century, Congress initiated an Indian land program that authorized the division of communal Indian property. Pursuant to this allotment policy, some Indian land was parcelled out to individual tribal members. Lands not allotted to individual Indians were opened to non-Indians for settlement. See Indian General Allotment Act of 1887, ch. 119, 24 Stat. 388. Allotted lands were held in trust by the United States or owned by the allottee subject to restrictions on alienation. On the death of the allottee, the land descended according to the laws of the State or Territory in which the land was located. 24 Stat. 389. In 1910, Congress also provided that allottees could devise their interests in allotted land. Act of June 25, 1910, ch. 431, § 2, 36 Stat. 856, codified as amended, 25 U. S. C. § 373.

The allotment policy "quickly proved disastrous for the Indians." *Irving*, 481 U. S., at 707. The program produced a dramatic decline in the amount of land in Indian hands. F. Cohen, Handbook of Federal Indian Law 138 (1982) (hereinafter Cohen). And as allottees passed their interests on to multiple heirs, ownership of allotments became increasingly fractionated, with some parcels held by dozens of owners.

Lawson, Heirship: The Indian Amoeba, reprinted in Hearing on S. 2480 and S. 2663 before the Senate Select Committee on Indian Affairs, 98th Cong., 2d Sess., 77 (1984) (hereinafter Lawson). A number of factors augmented the problem: Because Indians often died without wills, many interests passed to multiple heirs, H. R. Rep. No. 97–908, p. 10 (1982); Congress' allotment Acts subjected trust lands to alienation restrictions that impeded holders of small interests from transferring those interests, Lawson 78–79; Indian lands were not subject to state real estate taxes, Cohen 406, which ordinarily serve as a strong disincentive to retaining small fractional interests in land. The fractionation problem proliferated with each succeeding generation as multiple heirs took undivided interests in allotments.

The administrative difficulties and economic inefficiencies associated with multiple undivided ownership in allotted lands gained official attention as early as 1928. See L. Meriam, Institute for Government Research, The Problem of Indian Administration 40–41 (1928). Governmental administration of these fractionated interests proved costly, and individual owners of small undivided interests could not make productive use of the land. Congress ended further allotment in 1934. See Indian Reorganization Act, ch. 576, 48 Stat. 984, 25 U. S. C. § 461 *et seq.* But that action left the legacy in place. As most owners had more than one heir, interests in lands already allotted continued to splinter with each generation. In the 1960's, congressional studies revealed that approximately half of all allotted trust lands were held in fractionated ownership; for over a quarter of allotted trust lands, individual allotments were held by more than six owners to a parcel. See *Irving*, 481 U. S., at 708–709 (citing Senate Committee on Interior and Insular Affairs, Indian Heirship Land Survey, 86th Cong., 2d Sess., pt. 2, p. x (Comm. Print 1960–1961)).

In 1983, Congress adopted the ILCA in part to reduce fractionated ownership of allotted lands. Pub. L. 97–459, tit.

II, 96 Stat. 2517. Section 207 of the ILCA—the "escheat" provision—prohibited the descent or devise of small fractional interests in allotments. 96 Stat. 2519.[1] Instead of passing to heirs, such fractional interests would escheat to the tribe, thereby consolidating the ownership of Indian lands. Congress defined the targeted fractional interest as one that both constituted 2 percent or less of the total acreage in an allotted tract and had earned less than $100 in the preceding year. Section 207 made no provision for the payment of compensation to those who held such interests.

In *Hodel* v. *Irving*, this Court invalidated § 207 on the ground that it effected a taking of property without just compensation, in violation of the Fifth Amendment. 481 U. S., at 716–718. The appellees in *Irving* were, or represented, heirs or devisees of members of the Oglala Sioux Tribe. But for § 207, the appellees would have received 41 fractional interests in allotments; under § 207, those interests would escheat to the Tribe. *Id.*, at 709–710. This Court tested the legitimacy of § 207 by considering its economic impact, its effect on investment-backed expectations, and the essential character of the measure. See *id.*, at 713–718; see also *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124 (1978). Turning first to the economic impact of § 207, the Court in *Irving* observed that the provision's income-generation test might fail to capture the actual economic value of the land. 481 U. S., at 714. The Court next indicated that § 207 likely did not interfere with investment-backed expectations. *Id.*, at 715. Key to the decision in *Irving*, however, was the "extraordinary" character of the

---

[1] As originally enacted, § 207 provided:

"No undivided fractional interest in any tract of trust or restricted land within a tribe's reservation or otherwise subjected to a tribe's jurisdiction shall descedent [sic] by intestacy or devise but shall escheat to that tribe if such interest represents 2 per centum or less of the total acreage in such tract and has earned to its owner less than $100 in the preceding year before it is due to escheat." 96 Stat. 2519.

Government regulation. *Id.*, at 716. As this Court noted, § 207 amounted to the "virtua[l] abrogation of the right to pass on a certain type of property." *Ibid.* Such a complete abrogation of the rights of descent and devise could not be upheld. *Id.*, at 716–717.

## II

In 1984, while *Irving* was still pending in the Court of Appeals for the Eighth Circuit, Congress amended § 207. Pub. L. 96–608, § 1(4), 98 Stat. 3173.[2] Amended § 207 differs from the original escheat provision in three relevant respects. First, an interest is considered fractional if it both

---

[2] In 1990, Congress enacted minor revisions to § 207 that are not relevant here. Pub. L. 101–644, § 301, 104 Stat. 4666–4667. Amended § 207, codified at 25 U. S. C. § 2206, provides:

"(a) Escheat to tribe; rebuttable presumption

"No undivided interest held by a member or nonmember Indian in any tract of trust land or restricted land within a tribe's reservation or outside of a reservation and subject to such tribe's jurisdiction shall descend by intestacy or devise but shall escheat to the reservation's recognized tribal government, or if outside of a reservation, to the recognized tribal government possessing jurisdiction over the land if such interest represents 2 per centum or less of the total acreage in such tract and is incapable of earning $100 in any one of the five years from the date of the decedent's death. Where the fractional interest has earned to its owner less than $100 in any one of the five years before the decedent's death, there shall be a rebuttable presumption that such interest is incapable of earning $100 in any one of the five years following the death of the decedent.

"(b) Escheatable fractional interest

"Nothing in this section shall prohibit the devise of such an escheatable fractional interest to any other owner of an undivided fractional interest in such parcel or tract of trust or restricted land.

"(c) Adoption of Indian tribal code

"Notwithstanding the provisions of subsection (a) of this section, any Indian tribe may, subject to the approval of the Secretary, adopt its own code of laws to govern the disposition of interests that are escheatable under this section, and such codes or laws shall take precedence over the escheat provisions of subsection (a) of this section, provided, the Secretary shall not approve any code or law that fails to accomplish the purpose of preventing further descent or fractionation of such escheatable interests."

constitutes 2 percent or less of the total acreage of the parcel and "is incapable of earning $100 in any one of the five years [following the] decedent's death"—as opposed to one year before the decedent's death in the original § 207.  25 U. S. C. § 2206(a).  If the interest earned less than $100 in any one of five years prior to the decedent's death, "there shall be a rebuttable presumption that such interest is incapable of earning $100 in any one of the five years following the death of the decedent." *Ibid.*  Second, in lieu of a total ban on devise and descent of fractional interests, amended § 207 permits devise of an otherwise escheatable interest to "any other owner of an undivided fractional interest in such parcel or tract" of land.  25 U. S. C. § 2206(b).  Finally, tribes are authorized to override the provisions of amended § 207 through the adoption of their own codes governing the disposition of fractional interests; these codes are subject to the approval of the Secretary of the Interior.  25 U. S. C. § 2206(c).  In *Irving*, "[w]e express[ed] no opinion on the constitutionality of § 207 as amended."  481 U. S., at 710, n. 1.

Under amended § 207, the interests in this case would escheat to tribal governments.  The initiating plaintiffs, respondents here, are the children and potential heirs of William Youpee.  An enrolled member of the Sioux and Assiniboine Tribes of the Fort Peck Reservation in Montana, William Youpee died testate in October 1990.  His will devised to respondents, all of them enrolled tribal members, his several undivided interests in allotted trust lands on various reservations in Montana and North Dakota.  These interests, as the Ninth Circuit reported, were valued together at $1,239.  67 F. 3d 194, 199 (1995).  Each interest was devised to a single descendant.  Youpee's will thus perpetuated existing fractionation, but it did not splinter ownership further by bequeathing any single fractional interest to multiple devisees.

In 1992, in a proceeding to determine the heirs to, and claims against, William Youpee's estate, an Administrative

Law Judge (ALJ) in the Department of the Interior found that interests devised to each of the respondents fell within the compass of amended § 207 and should therefore escheat to the tribal governments of the Fort Peck, Standing Rock, and Devils Lake Sioux Reservations. App. to Pet. for Cert. 27a–40a. Respondents, asserting the unconstitutionality of amended § 207, appealed the ALJ's order to the Department of the Interior Board of Indian Appeals. The Board, stating that it did not have jurisdiction to consider respondents' constitutional claim, dismissed the appeal.

Respondents then filed suit in the United States District Court for the District of Montana, naming the Secretary of the Interior as defendant, and alleging that amended § 207 of the ILCA violates the Just Compensation Clause of the Fifth Amendment. The District Court agreed with respondents and granted their request for declaratory and injunctive relief. 857 F. Supp. 760, 766 (1994).

The Court of Appeals for the Ninth Circuit affirmed. 67 F. 3d 194 (1995). That court carefully inspected the 1984 revisions to § 207. Hewing closely to the reasoning of this Court in *Irving*, the Ninth Circuit determined that amended § 207 did not cure the deficiencies that rendered the original provision unconstitutional. In particular, the Ninth Circuit observed that amended § 207 "continue[d] to completely abolish one of the sticks in the bundle of rights [constituting property] for a class of Indian landowners." 67 F. 3d, at 200. The Ninth Circuit noted that "Congress may pursue other options to achieve consolidation of . . . fractional interests," including Government purchase of the land, condemnation for a public purpose attended by payment of just compensation, or regulation to impede further fractionation. *Ibid.* But amended § 207 could not stand, the Ninth Circuit concluded, for the provision remained "an extraordinary and impermissible regulation of Indian lands and effect[ed] an unconstitutional taking without just compensation." *Ibid.*

On the petition of the United States, we granted certiorari, 517 U. S. 1232 (1996), and now affirm.

### III

In determining whether the 1984 amendments to § 207 render the provision constitutional, we are guided by *Irving*.[3] The United States maintains that the amendments, though enacted three years prior to the *Irving* decision, effectively anticipated the concerns expressed in the Court's opinion. As already noted, amended § 207 differs from the original in three relevant respects: It looks back five years instead of one to determine the income produced from a small interest, and creates a rebuttable presumption that this income stream will continue; it permits devise of otherwise escheatable interests to persons who already own an interest in the same parcel; and it authorizes tribes to develop their own codes governing the disposition of fractional interests. These modifications, according to the United States, rescue amended § 207 from the fate of its predecessor. The Government maintains that the revisions moderate the economic impact of the provision and temper the character of the Government's regulation; the latter factor weighed most heavily against the constitutionality of the original version of § 207.

The narrow revisions Congress made to § 207, without benefit of our ruling in *Irving*, do not warrant a disposition different from the one this Court announced and explained in *Irving*. Amended § 207 permits a five-year window rather than a one-year window to assess the income-generating capacity of the interest. As the Ninth Circuit observed, however, argument that this change substantially mitigates the economic impact of § 207 "misses the point." 67 F. 3d, at

---

[3] In *Irving* we relied on *Penn Central Transp. Co.* v. *New York. City,* 438 U. S. 104 (1978). Because we find *Irving* dispositive, we do not reach respondents' argument that amended § 207 effects a "categorical" taking, and is therefore subject to the more stringent analysis employed in *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003 (1992).

199. Amended § 207 still trains on income generated from the land, not on the value of the parcel. The Court observed in *Irving* that "[e]ven if . . . the income generated by such parcels may be properly thought of as *de minimis*," the value of the land may not fit that description. 481 U. S., at 714. The parcels at issue in *Irving* were valued by the Bureau of Indian Affairs at $2,700 and $1,816, amounts we found "not trivial." *Ibid.* The value of the disputed parcels in this case is not of a different order; as the Ninth Circuit reported, the value of decedent Youpee's fractional interests was $1,239. 67 F. 3d, at 199. In short, the economic impact of amended § 207 might still be palpable.

Even if the economic impact of amended § 207 is not significantly less than the impact of the original provision, the United States correctly comprehends that *Irving* rested primarily on the "extraordinary" character of the governmental regulation. *Irving* stressed that the original § 207 "amount[ed] to virtually the abrogation of the right to pass on a certain type of property—the small undivided interest—to one's heirs." 481 U. S., at 716; see also *id.*, at 717 ("both descent and devise are completely abolished"). The *Irving* Court further noted that the original § 207 "effectively abolish[ed] both descent and devise [of fractional interests] even when the passing of the property to the heir might result in consolidation of property." *Id.*, at 716. As the United States construes *Irving*, Congress cured the fatal infirmity in § 207 when it revised the section to allow transmission of fractional interests to successors who already own an interest in the allotment.

Congress' creation of an ever-so-slight class of individuals equipped to receive fractional interests by devise does not suffice, under a fair reading of *Irving*, to rehabilitate the measure. Amended § 207 severely restricts the right of an individual to direct the descent of his property. Allowing a decedent to leave an interest only to a current owner in the

same parcel shrinks drastically the universe of possible successors. And, as the Ninth Circuit observed, the "very limited group [of permissible devisees] is unlikely to contain any lineal descendants." 67 F. 3d, at 199–200. Moreover, amended § 207 continues to restrict devise "even in circumstances when the governmental purpose sought to be advanced, consolidation of ownership of Indian lands, does not conflict with the further descent of the property." *Irving*, 481 U. S., at 718. William Youpee's will, the United States acknowledges, bequeathed each fractional interest to one heir. Giving effect to Youpee's directive, therefore, would not further fractionate Indian land holdings.

The United States also contends that amended § 207 satisfies the Constitution's demand because it does not diminish the owner's right to use or enjoy property during his lifetime, and does not affect the right to transfer property at death through nonprobate means. These arguments did not persuade us in *Irving* and they are no more persuasive today. See *id.*, at 716–718.

The third alteration made in amended § 207 also fails to bring the provision outside the reach of this Court's holding in *Irving*. Amended § 207 permits tribes to establish their own codes to govern the disposition of fractional interests; if approved by the Secretary of the Interior, these codes would govern in lieu of amended § 207. See 25 U. S. C. § 2206(c). The United States does not rely on this new provision to defend the statute. Nor does it appear that the United States could do so at this time: Tribal codes governing disposition of escheatable interests have apparently not been developed. See Tr. of Oral Arg. 42–43.

\*     \*     \*

For the reasons stated, the judgment of the Court of Appeals for the Ninth Circuit is

*Affirmed.*

JUSTICE STEVENS, dissenting.

Section 207 of the Indian Land Consolidation Act, 25 U. S. C. § 2206, did not, in my view, effect an unconstitutional taking of William Youpee's right to make a testamentary disposition of his property. As I explained in *Hodel* v. *Irving,* 481 U. S. 704, 719–720 (1987) (opinion concurring in judgment), the Federal Government, like a State, has a valid interest in removing legal impediments to the productive development of real estate. For this reason, the Court has repeatedly "upheld the power of the State to condition the retention of a property right upon the performance of an act within a limited period of time." *Texaco, Inc.* v. *Short,* 454 U. S. 516, 529 (1982). I remain convinced that "Congress has ample power to require the owners of fractional interests in allotted lands to consolidate their holdings during their lifetimes or to face the risk that their interests will be deemed to be abandoned." *Hodel,* 481 U. S., at 732 (STEVENS, J., concurring in judgment). The federal interest in minimizing the fractionated ownership of Indian lands—and thereby paving the way to the productive development of their property—is strong enough to justify the legislative remedy created by § 207, provided, of course, that affected owners have adequate notice of the requirements of the law and an adequate opportunity to adjust their affairs to protect against loss. See *ibid.*

In my opinion, William Youpee did have such notice and opportunity. With regard to notice, the requirements of § 207 are set forth in the United States Code. "Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply. . . . It is well established that persons owning property within a [jurisdiction] are charged with knowledge of relevant statutory provisions affecting the control or disposition of such property." *Texaco,* 454 U. S., at 531–532. Unlike the landowners in *Hodel,* Mr. Youpee also had adequate opportunity to comply.

More than six years passed from the time § 207 was amended until Mr. Youpee died on October 19, 1990 (this period spans more than seven years if we count from the date § 207 was originally enacted). During this time, Mr. Youpee could have realized the value of his fractional interests (approximately $1,239) in a variety of ways, including selling the property, giving it to his children as a gift, or putting it in trust for them. I assume that he failed to do so because he was not aware of the requirements of § 207. This loss is unfortunate. But I believe Mr. Youpee's failure to pass on his property is the product of inadequate legal advice rather than an unconstitutional defect in the statute.*

Accordingly, I respectfully dissent.

---

*Whether his heirs might have had a right to some relief from the author of Mr. Youpee's will if the Court had upheld the statute is not before us. Though not constitutionally required, it would certainly seem prudent for the Government or Mr. Youpee's lawyer to have notified him of § 207's requirements.