2003 DSD 9

Harvey DUMARCE, Kenneth Dumarce, and Colleen Renville Dumarce, Plaintiffs,

v.

Gale A. NORTON, Secretary of the Interior, her agents, assigns, and successors in office, the Department of the Interior of the United States, and the United States, Defendants.

No. CIV 02–1026.

United States District Court, D. South Dakota, Northern Division.

May 15, 2003.

David P. Graham, Leon R. Goodrich, Oppenheimer, Wolff & Donnelly, Minne-apolis, MN, Paul Edward Henry, Dakota Plains Legal Services, Sisseton, Ronald Dean Hutchinson, Dakota Plains Legal Services, Mission, for Plaintiffs.

Cheryl Schrempp Dupris, U.S. Attorney's Office, Pierre, Jo Ann M. Shyloski, Department of Justice, Environment & Natural Resources, Division, General Litigation Section, Washington, DC, Marcia M. Kimball, Department of Interior, Office of the Field Solicitor, Ft. Snelling, MN, Thomas L. Sansonetti, Department of Justice, Environment & Nat Resource Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

[¶ 1.] Harvey DuMarce, Kenneth DuMarce, and Colleen Renville DuMarce (collectively "the plaintiffs") instituted this action seeking declaratory, injunctive and monetary relief against the United States, the Department of the Interior, and the Secretary of Interior, Gale Norton, (collectively "the government"), alleging that section 5 of the Sisseton–Wahpeton Sioux Act of October 19, 1984, P.L. 98–513, 98 Stat. 2411 ("the Act"), unlawfully took land in which the plaintiffs had or would have had a legal interest, the taking being without just compensation and thus in violation of the Fifth Amendment to the United States Constitution. Small undivided interests in Indian allotments, instead of passing to the plaintiffs upon the death of their relatives, escheated to the United States to hold in trust for the Sisseton–Wahpeton Sioux Tribe.

[¶ 2.] The government, pursuant to Fed. R.Civ.P. 12(b)(1), filed a motion to dismiss, challenging this court's jurisdiction. In addition, as an alternative, the government, pursuant to Fed.R.Civ.P. 56, filed a motion for summary judgment. The plain-

tiffs, in turn, have filed their own motion for summary judgment.

### FACTUAL BACKGROUND

[¶ 3.] This case requires a "look back" to 1887. In that year, Congress passed the General Allotment Act of 1887, more commonly known as the Dawes Act, Ch. 119, 24 Stat. 388. The Dawes Act mandated the allotment of Indian reservation lands. *See generally,* F. Cohen, Handbook of Federal Indian Law, pp. 130–144, (1982 ed.). The purpose of allotment, according to its advocates, was to force Indians to abandon their traditional ways in order to "speed the Indians' assimilation in American society." *Solem v. Bartlett,* 465 U.S. 463, 466, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). More important, however, was the desire by allotment advocates to open up vast ranges of Indian reservation land for white settlement. *See* F. Cohen, *supra,* at 132 (stating that "[t]he pressure for Indian land was a powerful motivating force for the allotment policy"). Under the Dawes Act and a specific allotment act aimed at the Sisseton–Wahpeton Indian Reservation, Act of March 3, 1891, 26 Stat. 1035 (ratifying the 1889 agreement[1] between the government and the Tribe), Congress allotted each Tribal member 160 acres. 25 Stat. 1035. In order to supposedly protect the allottees from selling their lands to white settlers at disastrous prices, the allotment statutes provided that the allotted lands were to be held in trust by the United States. *See Hodel v. Irving,* 481 U.S. 704, 707, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987). There was, at that time, a view that the bureaucratic framework generally operated to safeguard Indian ownership of the allotted lands.[2] *Irving,* 481 U.S. at 707, 107 S.Ct. 2076.

[¶ 4.] In 1934, the allotment era was officially ended with the passage of the Indian Reorganization Act of 1934, Ch. 576, 48 Stat. 984. At that time, Congress changed its philosophy towards America's indigenous populations. Instead of trying to force western culture and society upon them, Congress decided to promote tribal self-government and tribal ownership of land. *See* F. Cohen, *supra,* at 147. The hope was that tribes, by and through their tribal governments, would interact with and adapt to a "modern world," rather than have that world and assimilation forced upon them. *Id.* The allotment process was abolished and individual allotments were indefinitely held in trust by the United States government. *Id.* at 148.

[¶ 5.] The Indian Reorganization Act, however, left unaffected the Dawes Act's procedures for the devise and descent of allotted land. Thus, when an allottee died, his interest in an allotted piece of land passed via the state's laws of intestacy or according to his or her will. After successive generations, acres of allotted land be-

---

1. As a part of that 1889 Agreement, the Sisseton–Wahpeton Sioux Tribe agreed to cede all un-allotted land to the United States for various amounts of money over time. The purpose was to allow white settlers and railroads access to lands previously held exclusively by the Tribe. For an expansive history of these events, *see DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (holding that the Sisseton–Wahpeton Lake Traverse Reservation was terminated, in large part, by the 1889 Agreement).

2. Despite Congress's paternalistic attempt to protect individual Indians from their own lack of familiarity in negotiating land sales and the shrewd cunningness of white land settlers and prospectors, the Dawes Act and its allotment requirements were utterly disastrous for Native Americans. By 1934, with the passage of legislation ending the allotment program, nearly 90 million acres of tribal land had been lost, about two-thirds of the total acreage held by tribes in 1887. *See* F. Cohen, *supra,* at 614 (recognizing the widely held belief that the allotment policy "had been terribly harmful" to Native Americans).

came incredibly splintered and owned, in some cases, by hundreds of individuals. Such fractionation, as the problem was labeled by some, created a problem, both administratively and practically, that grew and grew over time. *Irving,* 481 U.S. at 707, 107 S.Ct. 2076. Fractionation proved to be a bureaucratic nightmare that stymied economic development on Indian reservations and left many acres of potentially productive ground useless.[3]

[¶ 6.] An example of fractionation and the chaos that it causes on the Sisseton–Wahpeton Reservation was clearly illustrated by the United States Supreme Court in *Irving.* As the Court explained

[f]orty-acre tracts on the Sisseton–Wahpeton Lake Traverse Reservation, leasing for about $1,000 annually, are commonly subdivided into hundreds of undivided interests, many of which generate only pennies a year in rent. The average tract has 196 owners and the average owner [has] undivided interests in 14 tracts. The administrative headache this represents can be fathomed by examining Tract 1305, dubbed "one of the most fractionated parcels of land in the world." [Citation omitted.] Tract 1305 is 40 acres and produces $1,080 in income annually. It is valued at $8,000. It has 439 owners, one-third of whom receive less than $.05 in annual rent and two-thirds of whom receive less than $1. The largest interest holder receives $82.85 annually. The common denominator used to compute fractional interests in the property is 3,394,923,840,000. The smallest heir receives $.01 every 177 years. If the tract were sold (assuming the 439 owners could agree) for its estimated $8,000 value, he would be entitled to

$.000418. The administrative costs of handling this tract are estimated by the Bureau of Indian Affairs at $17,560 annually.

*Irving,* 481 U.S. at 712–13, 107 S.Ct. 2076. From everyone's viewpoint, therefore, the allotment program that began in 1887 and ended in 1934 still produces great difficulties today.

[¶ 7.] In an attempt to alleviate those difficulties and end the perpetual fractionation of allotted land, Congress, in the early 1980's, took action and passed the Indian Land Consolidation Act of 1983. The overriding aim was to prevent very small fractional interests from passing to a new generation. Instead of letting such interests pass to a new generation, thereby exacerbating the problem, Congress desired to have such small interests escheat to the relevant Indian tribe. Section 207, the escheat provision, provided that

No undivided fractional interest in any tract of trust or restricted land within a tribe's reservation or otherwise subjected to a tribe's jurisdiction shall descedent [sic] by intestacy or devise but shall escheat to that tribe if such interest represents 2 per centum or less of the total acreage in such tract and has earned to its owner less than $100 in the preceding year before it is due to escheat.

[¶ 8.] One year later, in 1984, Congress amended section 207 in three relevant respects. *See* P.L. 96–60 § 1(4), 98 Stat. 3137. The first important change altered the relevant time frame for determining whether the land produced more than $100.00. It lengthened that time period to five years. The second important change permitted one to devise a fractional interest (otherwise covered by section 207) to

---

**3.** Most fractionated land is rented to ranchers or farmers. While the land is productive from that standpoint, such rents produce nearly nothing to the individual Indian own-

ers as hundreds of people can own an interest that is, in and of itself, a mere fraction of the overall original allotment.

an individual who already owned an undivided interest in the same parcel of land. The final change permitted the Indian tribes to override section 207 through the adoption and implementation of their own codes governing the disposition of fractional interests.[4] Neither the original section 207 nor the amended version of it contained provisions for the payment of any compensation.

[¶ 9.] At that same time, Congress passed a specific statute to address the extreme fractionation occurring on the Sisseton–Wahpeton Indian Reservation, P.L. 98–513. Section 5 of that legislation provided, in relevant part, that

> no person shall be entitled by devise or descent to take any interest ... less than two and one-half acres, or the equivalent thereof, in trust or restricted land within the reservation. Any interest less than two and one-half acres of a devisee or intestate distributee of a decedent ... shall escheat to the tribe and title to such escheated interest shall be taken in the name of the United States in trust for the tribe: Provided, That [sic] the provisions of this section shall not be applicable to the devise or descent of any interest in trust or restricted land located within a municipality.

P.L. 98–513, Section 5. It is this section that is at issue here.

[¶ 10.] The instant dispute, while having its origins in the confused and misguided history of Congress's dealings with America's Indian tribes, began, at least as to plaintiff Colleen Renville DuMarce, when her father, Felix Renville, Sr., died in 1986. At the time of his death, Mr. Renville owned an interest in four parcels of land located on the Sisseton–Wahpeton Indian Reservation. The four parcels comprised

a total of 4.86 acres worth an estimated $1,587. Mr. Renville died testate and his will named Colleen as a devisee. The land, however, escheated to the Tribe pursuant to section 5 of P.L. 98–513.

[¶ 11.] Plaintiffs Harvey DuMarce and Kenneth Ervin DuMarce became engulfed in the allotment mess when their brother, Gerald Leon DuMarce ("Gerald"), died in 1995. At the time of his death, Gerald owned an interest in sixteen parcels of land located on the Sisseton–Wahpeton Reservation. The sixteen parcels produce a total acreage of 11.8 acres and are valued at $2,712.75. Gerald died intestate. While the court is unsure of exactly who all of Gerald's heirs are, it is undisputed that both Harvey and Kenneth, his brothers, are two of his lawful heirs. They, however, did not take title to the land; instead, it escheated to the Tribe pursuant to section 5 of P.L. 98–513.

[¶ 12.] On June 26, 2002, the plaintiffs filed suit, arguing that the land that escheated to the Tribe pursuant to section 5 was an unconstitutional taking of private property without just compensation in violation of the Fifth Amendment to the United States Constitution. The plaintiffs seek this court's declaration that section 5 violates the just compensation clause of the Fifth Amendment. They also seek an injunction prohibiting the defendants from escheating lands in the Sisseton–Wahpeton Indian Reservation to the Tribe pursuant to section 5, the restoration to the rightful owners of the lands unlawfully taken, the payment of just compensation for the plaintiffs' loss of use of the escheated lands prior to restoration, or, if the court were not inclined to order such relief, just compensation for the taking of the escheated lands.[5] For the reasons detailed below,

---

**4.** It appears that no Indian tribe has utilized this statutory override provision and developed its own procedures. *See Babbitt v. You-*

*pee,* 519 U.S. 234, 245, 117 S.Ct. 727, 136 L.Ed.2d 696 (1997).

**5.** The plaintiffs limit all of their damage re-

the court believes the government's motions should be denied and the plaintiffs' motion for summary judgment should be granted, in part.

## DISCUSSION

### I. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

[¶ 13.] "Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and statutes enacted by Congress pursuant thereto." *Marine Equipment Management Co. v. U.S.,* 4 F.3d 643, 646 (8th Cir.1993), citing *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 554, 106 S.Ct. 1326 (1986), citing in turn *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). "The threshold inquiry in every federal case is whether the court has jurisdiction" and the Eighth Circuit has admonished district judges to be attentive to a satisfaction of jurisdictional requirements in all cases. *See Sanders v. Clemco Industries,* 823 F.2d 214, 216 (8th Cir.1987).

[¶ 14.] A motion for lack of subject matter jurisdiction challenges the court's power to hear the case. *Mortensen v. First Federal Savings and Loan Association,* 549 F.2d 884, 891 (3rd Cir.1977). Jurisdictional issues are for the court to decide, and the court has broad power to decide its own right to hear a case. *Osborn v. United States,* 918 F.2d 724, 729 (8th Cir. 1990) (quoting *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981)). Because jurisdiction is a threshold question, judicial economy demands that the issue be decided at the onset. *Osborn,* 918 F.2d at 729.

[¶ 15.] The legal basis for the government's motion to dismiss for lack of jurisdiction rests upon its argument that the United States is immune from suit. It is well-settled that the United States, as a sovereign nation, is immune from suit except as it consents to be sued, and the terms of its consent to be sued define the contours of the court's jurisdiction. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), and *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). In advancing this argument, the government attempts to cast this case as a dispute about the ownership of the escheated lands, *i.e.,* a dispute about title to real property. From that vantage point, the government argues at length that the Quiet Title Act, 28 U.S.C. § 2409a, governs this case and that it expressly prohibits challenges to land held in trust for Indian tribes.

[¶ 16.] Whatever merit that argument, if any, might have, it is not applicable here. There is no dispute about who currently has title to the property in question. The United States has title to the property and is holding it in trust for the Sisseton–Wahpeton Sioux Tribe. The plaintiffs do not dispute that fact; they expressly acknowledge that the government has title to the property. Nothing in the plaintiffs' amended complaint hints that this is a title dispute case. To the contrary, the entire amended complaint speaks in terms of unconstitutional takings of private property in violation of the Fifth Amendment. In sum, there is no dispute that the United States currently has title to the property. While the plaintiffs, by way of relief, may want title to the property restored to them, the plaintiffs do not dispute that the United States currently has title to the property. The govern-

---

quests to an amount less than $10,000. If a larger amount were sought, this court would not have jurisdiction; the Federal Court of Claims would have sole jurisdiction. *See* The Tucker Act, 28 U.S.C. § 1491.

ment, it seems, has seized upon the plaintiffs' remedial request and has attempted to convert a rather unremarkable takings case into a quiet title action. The court will not follow the government's lead. There is no need to do so as the case is rightly denominated as a Fifth Amendment takings case. Thus, the Quiet Title Act does not apply here. The government's motion to dismiss should be denied. Jurisdiction is proper in this court.

## II. CROSS–MOTIONS FOR SUMMARY JUDGMENT

[¶ 17.] The summary judgment standard is well known and has been set forth by this court in numerous opinions. *See Hanson v. North Star Mutual Insurance Co.*, 1999 DSD 34 ¶ 8, 71 F.Supp.2d 1007, 1009–1010 (D.S.D.1999), *Gardner v. Trip County*, 1998 DSD 38 ¶ 8, 66 F.Supp.2d 1094, 1098 (D.S.D.1998), *Patterson Farm, Inc. v. City of Britton*, 1998 DSD 34 ¶ 7, 22 F.Supp.2d 1085, 1088–89 (D.S.D.1998), and *Smith v. Horton Industries*, 1998 DSD 26 ¶ 2, 17 F.Supp.2d 1094, 1095 (D.S.D.1998). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Donaho v. FMC Corp.*, 74 F.3d 894, 898 (8th Cir.1996). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir.1995).

[¶ 18.] As noted above, both parties have filed motions for summary judgment. The government's motion for summary judgment consists of two separate, unrelated arguments: (1) that the applicable statute of limitations prohibits plaintiff Colleen Renville DuMarce from obtaining any relief, and (2) that section 5 is constitutional because monetary relief is available under the Little Tucker Act, 28 U.S.C. § 1346(a)(2). The plaintiffs' motion for summary judgment is a direct attack on

the constitutionality of section 5 itself. In unraveling the somewhat twisted summary judgment arguments, the court will first address the issue of section 5's constitutionality. That analysis will necessarily resolve the government's arguments concerning the Little Tucker Act. The court will then turn to the specific statute of limitations arguments raised by the government in regards to the claims of plaintiff Colleen Renville DuMarce.

## A. CONSTITUTIONALITY OF SECTION 5

[¶ 19.] The Takings Clause of the Fifth Amendment of the United States Constitution, provides: "[N]or shall private property be taken for public use, without just compensation." "As its language indicates ..., this provision does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Government action that takes property or property rights necessarily implicates the "constitutional obligation to pay just compensation." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

[¶ 20.] In determining whether a taking has occurred, the Supreme Court does not employ a set formula but engages in essentially "ad hoc, factual inquiries." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). That process, however, is not without standards. "The economic impact of the regulation, especially the degree of interference with investment-backed expectations, is of particular significance." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

"So, too, is the character of the governmental action." *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. When the governmental action constitutes actual physical occupation of the property, compensation for such a physical takeover is *never* denied. *See Loretto*, 458 U.S. at 428 n. 5, 102 S.Ct. 3164 quoting Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 Harv.L.Rev. 1165, 1184 (1967) (emphasis in original).

[¶ 21.] Fortunately, the United States Supreme Court has twice before considered takings claims nearly identical to those advanced in this case. In *Hodel v. Irving*, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987), the Supreme Court declared that section 207 of the Indian Land Consolidation Act of 1983 was unconstitutional. In reaching that decision, the Court noted that "the right to pass on valuable property to one's heirs is itself a valuable property right." *Id.* at 715, 107 S.Ct. 2076. That right, the Court observed, "has been part of the Anglo–American legal system since feudal times." *Id.* 716, 107 S.Ct. 2076. Section 207 extinguished that important property right by requiring small undivided interests in allotted lands to escheat to the relevant Indian tribe. Such a total abrogation of the right to pass property to one's heirs, the Court determined, could not be upheld. *Id.* at 717, 107 S.Ct. 2076. Similarly, in *Babbitt v. Youpee*, 519 U.S. 234, 117 S.Ct. 727, 136 L.Ed.2d 696 (1997), the Supreme Court declared that the amended version of section 207 was unconstitutional as well. The Court noted that *Irving* and the unconstitutionality of section 207 primarily rested on the "extraordinary" character of the governmental regulation, *i.e.,* the total abrogation of a property owner's right to pass on his property interests to his heirs. *Id.* at 244, 117 S.Ct. 727. The amendments to section 207 "miss[ed] the point," the Supreme Court determined, because they

did nothing to alter the escheat provisions requiring small, undivided interests in allotted parcels to escheat to the tribe. *Id.* at 243, 117 S.Ct. 727.

■ [¶ 22.] As the plaintiffs in this case aptly point out, there is very little that differs between section 207, amended 207, and section 5 of the Sisseton–Wahpeton Sioux Act. Most importantly, the statutes cut-off a decedent's ability to pass his or her undivided interest in allotted parcels to his or her heirs by both devise and descent. Instead of passing to one's heirs, the interest, in a case governed by section 5, passes to the United States as trustee for the benefit of the Sisseton–Wahpeton Sioux Tribe. The governmental regulation, therefore, remains "extraordinary." *Irving*, 481 U.S. at 716, 107 S.Ct. 2076. The right of an enrolled member of the Sisseton–Wahpeton Sioux Tribe to pass on small undivided interests in allotments is completely abrogated. In light of the Supreme Court's holdings in both *Irving* and *Youpee*, this court has little trouble in concluding that section 5 violates the Fifth Amendment. It is a complete taking of the property.

[¶ 23.] Instead of really addressing *Irving* and *Youpee*, the government, in arguing that section 5 passes constitutional muster, contends that, because compensation is available under the Little Tucker Act, 28 U.S.C. § 2401(a)(2), section 5 comports with the Fifth Amendment. Such an argument, however, completely ignores both *Irving* and *Youpee*. In neither case did the Supreme Court hesitate to strike down section 207 and amended 207 because of the Little Tucker Act. In fact, the Little Tucker Act is never mentioned in either opinion. That silence speaks volumes. This court will not assume that the Supreme Court, and the government lawyers appearing before it on behalf of the United States, "missed" the Little Tucker

Act or "forgot" about it. Instead, this court will follow the Supreme Court's lead and side-step the government's suggested Little Tucker Act analysis. Its existence did not save section 207 or amended section 207 from being declared unconstitutional. It will not save section 5 either. Section 5 runs afoul of the Just Compensation Clause of the Fifth Amendment. It is, therefore, unconstitutional.[6]

## B. STATUTE OF LIMITATIONS AND PLAINTIFF COLLEEN RENVILLE DUMARCE

[¶ 24.] As the case pertains to plaintiff Colleen Renville DuMarce only, the government argues that it is entitled to summary judgment as her claims are barred by the applicable statute of limitations. In response, Renville DuMarce argues (1) that the government, as trustee, breached fiduciary duties it owed to her, effectively tolling the statute of limitations, (2) that the unconstitutional taking continues and is, therefore, a continuing violation, and (3) that the running of the statute of limitations should be equitably tolled.

[¶ 25.] Before turning to the statute of limitations debate directly, the court believes it must first consider the correct statute of limitations that maybe applicable in this case. The government argues that the six-year statute of limitations contained in the Little Tucker Act controls. *See* 28 U.S.C. § 2401. The plaintiffs offer no alternative. Given the court's decision above regarding the applicability of the Little Tucker Act generally, the court is somewhat hesitant to use its statute of limitations in this case. Nonetheless, given the plaintiffs' acquiescence to the government's use of it, and, more importantly, the court's finding, detailed below, that the government breached its fiduciary obligations owed to Renville DuMarce, selecting the right statute of limitations is a non-issue. For purposes of this decision, therefore, the court will use the six-year cut-off contained in the Little Tucker Act.

[¶ 26.] As noted above, Renville Du-Marce's father died in 1986. It was at that time that section 5 was applied to interests in the four parcels of land owned by him which caused them to escheat to the United States in trust for the tribe. Without some sort of tolling of the statute of limitations, therefore, Renville DuMarce's claims would be barred.

[¶ 27.] "[T]he law is 'well established that the Government in its dealings with Indian tribal property acts in a fiduciary capacity.'" *Lincoln v. Vigil*, 508 U.S. 182, 194, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), quoting *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987). That fiduciary duty "extends not only to Indian Tribes as governmental units, but to tribal members living collectively or individually, on or off the reservation." *Loudner v. United States*, 108 F.3d 896, 901 (8th Cir.1997).

The statute of limitations begins to run when a trust beneficiary knows or should know of the beneficiary's claim

---

**6.** On the last pages of the parties' briefs, the parties wage a quiet footnote debate concerning whether, assuming that the land has been taken, it was taken for a public use. Although the issue has not been directly placed in issue, the court, on its own initiative, has pursued the issue and is satisfied that the attempt to end the on-going fractionation of undivided interests in allotted land on Indian reservations is a valid public purpose. *See Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 241, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) (stating that the Supreme Court "will not substitute its judgment for a legislature's judgment as to what constitutes a public use [for purposes of the Fifth Amendment] 'unless the use be palpably without reasonable foundation.'"), quoting *United States v. Gettysburg Electric R. Co.*, 160 U.S. 668, 680, 16 S.Ct. 427, 40 L.Ed. 576 (1896).

against the trustee. Nonetheless, because the beneficiary is entitled to rely upon the good faith and expertise of the trustee, the beneficiary's duty to discover claims against the trustee is somewhat lessened. [Citations omitted]. The beneficiary's duty to discover his or her claims against the trust is further diminished when the beneficiary has no idea that the trust even exists. One of the fundamental obligations of a trustee is the identification and notification of trust beneficiaries.

*Id.* at 901.

[¶ 28.] The issue for determination, therefore, is ascertaining when Renville DuMarce either knew or should have known of her claim against the United States. The answer to that question is hotly debated by the parties. The government contends that, because *Irving* was decided in 1987, Renville DuMarce was put on notice in 1987.[7] Renville DuMarce counters by arguing that, because section 207 had been amended prior to the *Irving* decision, there was sufficient uncertainty surrounding the applicability of *Irving* to cast doubt on her awareness of a claim against the government. That doubt, Renville DuMarce contends, was not dissipated until *Youpee* was decided in 1997. In addition, Renville DuMarce argues that it is impractical for the law to require her, a non-lawyer, to periodically check the status of certain aspects of federal Indian law. Given the trust relationship, she argues, the government had the burden and obligation to make those inquiries and inform her of any developments.

■ [¶ 29.] Renville DuMarce's arguments are well-taken. It does seem odd that the government, as trustee, would advance an argument requiring the trust beneficiary, a non-lawyer, to actively investigate whether she has claims against the trustee. Such a scenario would turn the trustee relationship upside-down. In addition, the court also believes that, because of the amendment of section 207, sufficient ambiguity existed regarding its application to excuse a non-lawyer trust beneficiary from steadfastly relying upon it. Finally, the court also finds that it would be inequitable to permit the government, as trustee, to enact unconstitutional statutes that directly work to the disadvantage of the trust beneficiaries, remain silent, let time pass, and then raise that passage of time as a defense to its unconstitutional behavior. This court will not condone such behavior. A trustee, especially the United States, must do more.

[¶ 30.] Accordingly, Renville DuMarce will be permitted to proceed in this case. Although her claims are rather old, the court finds, as a matter of law, that the government breached a fiduciary duty owed to her by failing to inform her of her potential cause of action against the United States. Certainly, the United States knew and understood the *Irving* decision in 1987. The government's failure to inform those burdened by similar statutes should lie at its feet and not at the feet of the beneficiaries of the trust relationship. The government's motion for summary judgment, therefore, should be denied.

### III. REMEDY

■ [¶ 31.] Given the circumstances of this case, the court is hesitant, at this time, to launch into the remedial phase of this case. As noted above, the plaintiffs re-

---

7. The government's argument that Renville DuMarce was put on notice when her father's proprietary interests escheated to the government in 1986 is without merit. Prior to *Irving* in 1987, no such escheat provision in any statute had been definitively struck down as violating the Fifth Amendment. Without *Irving*, therefore, there was no notice of any potential lawsuit against the government.

quest various forms of relief, beginning with an injunction ordering the government to reopen the estates of Felix Renville and Gerald Leon DuMarce and to restore title to their lands in the plaintiffs, an injunction prohibiting the Department of the Interior from escheating lands pursuant to section 5 to the United States, compensation for the loss of use of the land, and, finally, as an alternative, just compensation for the taken lands. The government, not surprisingly, does not offer any remedial solutions. Given the current posture of this case, the time that has passed since the decedents at issue in this case died, and the fact that this case will have an impact on the Sisseton–Wahpeton Indian Reservation that will go well beyond this case, the court is somewhat hesitant to order immediate relief.[8] While the court is tempted to order just compensation for the taken land, that is not the relief primarily sought by the plaintiffs. Thus, the court decides that, given the circumstances of this case, the court will refrain from ordering any relief at this time, save, of course, a declaration that section 5 is unconstitutional. The court wants to afford the government an opportunity to propose a remedy that would satisfy the plaintiffs as well as ease the potential administrative burden of complying with any order of the court. Giving the government that opportunity also effectively moots the issue of whether the Sisseton–Wahpeton Sioux Tribe is an indispensable party under Fed.R.Civ.P. 19.[9] Given the absence of the relevant tribes in *Irving* and *Youpee*, the court has no doubts that the tribe is not an indispensable party, at least at this stage of the proceedings. Nonetheless, the court will proceed cautiously. Hopefully the government will chart a course that is acceptable to all. If no mutually satisfying conclusion can be arranged between the parties within sixty days of the date of this opinion, the court will revisit this issue with an eye towards appointing a special master. Hopefully, that will not be necessary.

### *ORDER*

[¶ 32.] Now, therefore, in light of the foregoing,

[¶ 33.] IT IS ORDERED

(1) Section 5 of the Sisseton–Wahpeton Sioux Act of October 19, 1984, P.L. 98–513, 98 Stat. 2411, is unconstitutional as in violation of the Fifth Amendment.

8. The court's hesitancy is underscored by a lack of information regarding the frequency with which section 5 is used. The court assumes, at this point, given the extreme fractionation of lands on the Sisseton–Wahpeton Indian Reservation, that section 5 is frequently used to escheat applicable lands to the government. Given the lack of specifics in this regard, the court will not rush into the remedial phase of this case. The court does not want to unknowingly burden the already heavily-burdened administration of the trust allotments on the reservation.

9. For purposes of declaring section 5 unconstitutional, the Sisseton–Wahpeton Sioux Tribe is not an indispensable party under Fed. R.Civ.P. 19. However, any court order directing the United States to return taken lands to their lawful owners could very well require the Tribe's participation. To avoid that, the court encourages the parties to reach a resolution aimed at securing just compensation for the taken lands. From the court's perspective, that resolution would be the least burdensome to the government while also affording the plaintiffs (and those similarly situated) payment for interests in lands that are virtually inalienable because of the multitude of owners. Put another way, receiving just compensation, from the court's viewpoint, would be more preferable for the plaintiffs than having title to a fraction of an allotment restored to them that is similarly owned by dozens and possibly hundreds of others and is, for all practical purposes, incapable of being sold for fair market value.

(2) The government's motion, Doc. 38, seeking leave to file a supplemental brief, Doc. 37, is granted.

(3) The plaintiffs' motion for leave to file another response, Doc. 40, is denied as moot.

(4) The government's motion, Doc. 12, to dismiss and for summary judgment is denied.

(5) The plaintiff's motion, Doc. 23, for summary judgment is granted in part, as outlined above.