Rosa **SHACKLEFORD, personal representative of the Estate of Thomas J. Shackleford, Deceased, Plaintiffs–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant.**

**No. 99–17541.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 2001

Filed Aug. 28, 2001

Annette M. Wietecha and Jonathan S. Cohen, Assistant United States Attorneys, Tax Division, Washington D.C., for the defendant-appellant.

Linda L. Goodman and Steven S. Richter, Goodman & Richter, LLP, San Diego, California, for the plaintiffs-appellees.

Before: O'SCANNLAIN, TASHIMA and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

This appeal presents the question of whether a statutory anti-assignment restriction on lottery payments justifies departure from the Department of Treasury's annuity tables when determining the asset's present value in calculating estate tax. Under the circumstances of this case, we conclude that it does and affirm the judgment of the district court.

## I

Fran Lebowitz may have rightly observed that a person has the same chance of winning the lottery whether one plays or not. However, contrary to Steve Martin's early comedy routine,[1] the probability of tax imposition on the prize is almost 100%.

Like most lottery winners, retired Air Force officer Thomas J. Shackleford probably wasn't thinking of tax consequences when he hit the $10 million California Lotto in 1987. Nor were his heirs. However, the estate tax problem became abundantly clear upon Shackleford's untimely death after receiving only three of twenty $508,000 annual payments. At that time, California law prohibited any assignment of lottery payments. Cal. Gov't Code § 8880.32(g). On death, future payments were to be made to a deceased winner's estate according to the annuity terms. *Id.* However, the payment of federal estate tax is not similarly structured. Thus, although the estate was limited to receiving annual installments, the estate tax was calculated based on the present value of the income stream, due on a much shorter schedule. Under the present value annuity tables in the Treasury regulations, 26 C.F.R. § 20.2031–7, the present value of the remaining payments was calculated to be $4,023,903. This meant that the estate owed $1,543,397 in federal estate taxes without any concomitant source of revenue to fund the payment.

The estate initially filed a return that reported the federal estate tax liability in accordance with the Treasury regulation tables and paid a total federal estate tax liability in the amount of $1,543,397. After auditing the return, the Internal Revenue Service ("IRS") found no error in the reported tax. Subsequently, the estate filed both amended tax returns and claims for refund, asserting that the value of the future payments was improperly reported. The last of the claims for refund argued that the proper value of the lottery payments was zero. In the alternative, the estate argued that use of the annuity tables to value the payments resulted in an unrealistic and unreasonable value because it did not reflect the fair market value of the asset. The IRS rejected the final refund claim, and the estate filed its claim for refund in district court.

The government filed a motion for summary judgment arguing that the estate was not entitled to a refund because the payments were an annuity for a term of years, the value of which was properly determined under the tables in 26 C.F.R. § 20.2031–7. The district court denied the motion, holding that if the estate could prove that the true value of the interest was substantially below the value attributed by the tables then departure would be warranted. *Shackleford v. United States,* No. 98–105580, 1998 WL 723161 (E.D.Cal. July 29, 1998). After a bench trial, the district court found that the lack of a market must be considered in determining a fair valuation of property for estate tax purposes and that because marketability is not a factor considered by the tables, using them would result in "a substantially unrealistic and unreasonable result." *Shackleford v. United States,* No. Civ. S–96–1370, 1999 WL 744121, *3 (E.D.Cal. August 6, 1999). The court thereupon departed from the tables and valued the payments at $2,012,500. *Id.* Based on this valuation, the parties stipulated to a judgment for the estate in the amount of $1,622,674.86 ($1,104,156.27 in tax and $518,518.59 in interest).

---

**1.** The relevant portion of the stand-up act, which is themed "how to be a millionaire and never pay taxes," is featured as "Excuse Me" on *Let's Get Small* (Warner Bros.1977). The secret, Martin advised, was simply to tell the government that "I forgot."

■ The government timely appealed the district court's statutory interpretation, which is a question of law that we review *de novo*. *Leicester v. Warner Bro*, 232 F.3d 1212, 1225 (9th Cir.2000).

## II

The Internal Revenue Code imposes an estate tax on the "taxable estate of every decedent who is a citizen or resident of the United States." 26 U.S.C. § 2001. The "taxable estate" is calculated by subtracting any allowable deductions from the value of the gross estate. 26 U.S.C. § 2051. The gross estate includes the total "[v]alue at the time of his death of all property, real or personal, tangible or intangible, wherever situated[,]" to the extent the decedent had an interest in the property. 26 U.S.C. §§ 2031, 2033. This includes the value of annuities; thus, the value of the future lottery payments is included in Shackleford's gross estate. 26 U.S.C. § 2039.

The "value" of property to be included in the gross estate is the fair market value of the item at the time of the decedent's death. 26 C.F.R. § 20.2031–1(b).

The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. Nor is the fair market value of an item of property to be determined by the sale price of the item in a market other than that in which such item is most commonly sold to the public, taking into account the location of the item wherever appropriate.... All relevant facts and elements of value as of the applicable valuation date shall be considered in every case.

26 C.F.R. § 20.2031–1(b).

■ Non-commercial annuities, such as the lottery payments at issue, are valued pursuant to tables promulgated by the Secretary of the Treasury, except when another regulatory provision applies. 26 U.S.C. § 7520. The general "fair market value" regulation quoted above, 26 C.F.R. § 20.2031–1(b), is such a provision, allowing departure from the tables "where they do not produce a value that reasonably approximates the fair market value...." *O'Reilly v. Comm'r*, 973 F.2d 1403, 1407 (8th Cir.1992).

The IRS has explained that the "[v]aluation factors for determining the present value of interests measured by a term certain are based on two components: a term of years component and an interest rate component." Notice 89–24, 1989–1 C.B. 660. Although the tables provide the presumptive valuation of non-commercial annuities, courts have long recognized that a table-produced valuation is not applicable when the result is unrealistic and unreasonable. *See, e.g., Weller v. Comm'r*, 38 T.C. 790, 803, 1962 WL 1155 (1962). In such cases, a modification to the valuation or a complete departure from the tables may be justified.

As the Eighth Circuit explained:

When use of the tables produces a substantially unrealistic and unreasonable result *and* when a more reasonable and realistic valuation technique is available, faith that the tables will "average out" in the long run will not suffice. Compliance with the statute and fairness in the particular case require that the reviewing court use that alternative method to determine the fair market value of the gifted property.

*O'Reilly,* 973 F.2d at 1409. *See also Estate of Christ v. Comm'r,* 480 F.2d 171, 172 (9th Cir.1973) (approving of tax court's adoption of *Hanley v. United States,* 105 Ct.Cl. 638, 63 F.Supp. 73, 81 (1945), which held that the tables are to apply unless the result would be "substantially at variance with the facts"); *Froh v. Comm'r,* 100 T.C. 1, 3–4, 1993 WL 1869 (1993) ("use of the actuarial tables is presumptively correct unless it is shown that such use is 'unrealistic and unreasonable' ").

■ For these reasons, although the general rule requires that the tables be used because they provide both certainty and convenience when applied in large numbers of cases, *see Bank of California v. United States,* 672 F.2d 758, 759–60 (9th Cir.1982), exceptions have been made when the tables do not reasonably approximate the fair market value of the asset. However, because the table-produced valuation is presumed correct, the party who desires to use an alternative method to value an estate's interest bears the "considerable burden of proving that the tables produce such an unrealistic and unreasonable result that they should not be used." *O'Reilly,* 973 F.2d at 1408.

## III

■ In this case, the district court concluded that the discount tables did not reasonably approximate the fair market value of the lottery payments because California's statutory anti-assignment restriction reduced the fair market value. The district court's conclusion is consistent with tax theory. Indeed, the reality of a decedent's economic interest in any particular property right is a major factor in determining valuation for estate tax purposes. *Helvering v. Safe Deposit Trust Co. of Baltimore,* 316 U.S. 56, 62 S.Ct. 925, 86 L.Ed. 1266 (1942). Each of the characteristics of a property interest must be considered in determining its value for taxing purposes. *Cf. Guggenheim v. Ras-*

*quin,* 312 U.S. 254, 257, 61 S.Ct. 507, 85 L.Ed. 813 (1941); Rev. Rul. 77–287, 1977–2 C.B. 319. The right to transfer is "one of the most essential sticks in the bundle of rights that are commonly characterized as property[.]" *Youpee v. Babbitt,* 67 F.3d 194, 197 (9th Cir.1995), *aff'd Babbitt v. Youpee,* 519 U.S. 234, 117 S.Ct. 727, 136 L.Ed.2d 696 (1997). It is axiomatic that if an asset's marketability is restricted, it is less valuable than an identical marketable asset. *Mailloux v. Comm'r,* 320 F.2d 60, 62 (5th Cir.1963). We have long recognized that restrictions on alienability reduce value. *See e.g., Bayley v. Comm'r,* 624 F.2d 884, 885 (9th Cir.1980) (holding that stock transfer restrictions affect valuation); *Trust Services of Am., Inc. v. United States,* 885 F.2d 561, 569 (9th Cir.1989) ("[I]f stock is subject to resale restrictions under the federal securities laws which prevent it from being sold freely in the public market, a discount from the mean may be necessary to measure the stock's value accurately." (citation omitted)). *Estate of Jung v. Comm'r,* 101 T.C. 412, 434, 1993 WL 460544 (1993) (because stock of closely held corporations is not publicly traded, minority shares ordinarily receive "[a] marketability discount [to reflect] the hypothetical buyer's concern that there will not be a ready market when that buyer decides to sell the stock"); *see also Theophilos v. Comm'r,* 85 F.3d 440, (9th Cir.1996) (minority shareholders in close corporations generally receive a discount to reflect lack of control).

In this case, there is little doubt that the statutory restrictions on transfer reduced the fair market value of the right to receive future lottery payments. The district court, after considering expert testimony on the point, reached the same conclusion in finding that the "[u]se of the annuity tables produces a substantially unrealistic and unreasonable result because the table does not reflect the discount

which must be taken by virtue of the non-liquidity of the prize." *Shackleford v. United States*, No. Civ. S–96–1370, 1999 WL 744121, *3 (E.D.Cal. August 6, 1999).

 Contrary to the government's argument, the lack of a market due to the anti-assignment restriction does not mean that the asset cannot be valued except by the tables. Where a willing seller and willing buyer do not exist, we will presume both their presence and a hypothetical sale. *Bank of California, N.A., v. Comm'r*, 133 F.2d 428, 433 (9th Cir.1943). Thus, given the expert testimony presented, the district court did not err in analyzing fair market value by assuming a hypothetical market.

The government also contends that allowing consideration of alienability in determining fair market value would undercut the bright line regulatory rule established by employment of the tables. Of course, this "bright line rule" has not deterred the IRS from seeking exceptions when it is the disadvantaged party. In fact, the IRS has often taken advantage of the economic reality rationale for departure from the tables, urging that the table-produced result under-values the particular asset at issue. *See, e.g., O'Reilly*, 973 F.2d at 1404; *Estate of Lion v. Comm'r*, 438 F.2d 56 (4th Cir.1971); *Froh v. Comm'r*, 100 T.C. 1, 1993 WL 1869 (1993), *aff'd*, 46 F.3d 1141 (9th Cir.1995) (unpublished).

More importantly, consideration of transfer restrictions in a fair market analysis does not alter the presumption that the value provided by the tables is correct and subject to revision only if the party seeking departure shows that the tables produce an unrealistic and unreasonable value. In such a case, if the taxpayer proves that a more realistic and reasonable valuation method exists that more closely approximates fair market value, courts are free to employ it. In this case, on the basis of the evidence presented, the district court concluded that strict application of the discount tables did not accurately reflect economic reality and reached an alternate determination of fair market value. We cannot say that the district court erred in this assessment.

As to the floodgates that the government believes to be opened by the injection of economic reality, one must only note the improbability of the confluence of government intervention, untimely death, and the lotto. But then again, "[t]here's always been a lottery." Shirley Jackson, *The Lottery & Other Stories* (New York: Farrar, Straus and Giroux, 1982) p. 297.

**AFFIRMED.**