United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 13, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-61011

GLADYS J. COOK, Estate of Gladys J. Cook, Deceased,
Verna Lee Steele, Executrix,

Petitioner-Appellant,

VERSUS

COMMISSIONER OF THE INTERNAL REVENUE SERVICE,

Respondent-Appellee.

Appeal from a Decision
of the United States Tax Court

Before DAVIS, SMITH, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge:

Appellants ask this Court to reverse the Tax Court's conclusion that a non-transferrable lottery prize payable in seventeen annual installments is a private annuity that must be valued, for estate tax purposes, in accordance with 26 U.S.C. § 7520. Because we conclude that the prize is properly characterized a private annuity, and that non-marketability does not render the valuation of the prize under § 7520 and the regulations unreasonable, we affirm.

**I. Factual and Procedural History**

Gladys Cook and her sister-in-law Myrtle Newby had a longstanding informal agreement under which they jointly purchased Texas lottery tickets and shared the winnings. On July 8, 1995, Cook bought a winning ticket valued at $17 million, payable in 20 annual installments. The initial payment of $858,648 was made July 10, 1995, and the remaining payments of $853,000 each would be made on July 15th of the next 19 years. Texas law prohibited the assignment, other than by court order, of the right to receive the lottery payments; neither could the prize be collected in a lump sum.

On July 12, 1995, Cook and Newby converted their informal partnership to a formal limited partnership, MG Partners, Limited ("MG Partners" or the "partnership"), and each assigned her interest in the lottery winnings to the partnership.[1] In exchange, each received a 48% limited partnership interest and a 2% general partnership interest.

Cook died November 6, 1995. The partnership's assets on that date, the valuation date for estate tax purposes, were $391,717 in cash and the right to receive 19 annual lottery payments of $853,000 each. The parties stipulated that, because of the prohibition on transfer of the lottery prize, no market for the right to lottery payments existed in Texas at the time of Cook's death.

Cook's executor hired a valuation expert, Peter Phalon. Phalon valued the partnership's right to lottery payments at $4,575,000, using a discounted cash flow method and including a discount for non-marketability. He valued the Estate's interest in the partnership at $1,529,749, which amount the Estate included on its tax return.

---

[1] To address the apparent inconsistency posed by Cook and Newby transferring the non-transferrable lottery prize to MG Partners, Ltd., the Estate explains that the partnership itself won the prize, and the document titled "Assignment" in the partnership agreement was not a true assignment in violation of the state law restriction; instead, it was a formalization of the already existing partnership. The Commissioner has accepted the partnership as owning the lottery prize for purposes of this litigation.

The Commissioner assessed a deficiency based on the value of the partnership interest. Rejecting the expert valuation relied on by the Estate, the Commissioner valued the partnership's right to the lottery payments using 26 U.S.C. § 7520 and the accompanying regulations (the "annuity tables"), which govern the valuation of private annuities. The value under the annuity tables was $8,557,850. The Commissioner then valued the Estate's partnership interest, discounted for lack of control, restrictions in the partnership agreement, and lack of a ready market, at $3,222,919, yielding a deficiency in the tax paid by the Estate of $873,554.

The Estate petitioned the Tax Court for a redetermination of the deficiency, contending that the Commissioner erred in using the annuity tables to value the lottery prize held by the partnership. The Estate procured a second expert valuation, and the Commissioner procured its own expert in the event that the annuity tables were held not to apply.[2] Foregoing trial under Tax Court Rule 122, the parties stipulated that the only remaining disputed issue was whether the lottery prize must be valued according to the annuity tables for purposes of valuing the partnership interest.[3] The parties stipulated to alternate values for the partnership interest, agreeing that if the prize must be valued under the annuity tables, the value of the partnership interest was $2,908,605; if not, it was $2,237,140.

The Tax Court held that it was bound under a previous Tax Court case, Gribauskus v. Commissioner, 116 T.C. 142 (2001), to value the lottery payments using the annuity tables.

---

[2] William Frazier, the Estate's expert, valued the payments at $6,053,189 and the partnership interest at $2,067,867. The Commissioner's expert, Francis Burns, valued the payments at $5,762,791 and the partnership interest at $2,406,413. Both experts discounted the value of the lottery prize for non-marketability.

[3] Stipulations are at Rec. Ex. Tab 2.

3

Gribauskas, which has since been reversed by the Second Circuit,[4] held that a lottery prize is a private annuity that must be valued under the annuity tables. The Estate appeals, asserting that the Tax Court erred in valuing the lottery prize rather than the partnership, and alternatively, in determining that the annuity tables do not assign an unreasonable value to the lottery prize.

## DISCUSSION

### A. Standard of review

We review the Tax Court's factual findings for clear error, see, e.g. McIngvale v. Comm'r, 936 F.2d 833, 836 (5th Cir. 1991), and its conclusions of law de novo. See American Home Assurance Co. v. Unitramp Ltd., 146 F.3d 311, 313 (5th Cir. 1988). Mathematical computation of fair market value is a factual issue; however, determination of which is the proper valuation method is a question of law. Estate of Dunn v. Comm'r, 301 F.3d 339, 348 (5th Cir. 2002).

### B. The asset to be valued

The Estate challenges the Tax Court's conclusion that ownership of the prize by the partnership, rather than outright by Mrs. Cook, made no difference to the question of its value. The Estate contends that the Tax Court's error is evident in its statement that it saw "no difference between a right to receive lottery payments that is owned by a partnership in which decedent owned an interest and an identical right to receive lottery payments that was owned directly by decedent. In both instances, the asset must be given a value in order to determine the tax consequences to the Estate." The Estate argues that Mrs. Cook's partnership interest, rather than the lottery prize itself, is the asset that must be valued. We do not agree, however, that the Tax Court was asked to value the partnership. The stipulations clearly frame the issue in terms of whether the lottery prize owned

---

[4] Gribauskas v. Commissioner, 2003 WL 22006241 (2nd Cir. 2003), discussed infra.

4

by the partnership must be valued under the annuity tables.[5]

The Estate asserts that the asset-based approach is not the only way to value the partnership interest, but if a lottery prize must always be valued using the annuity tables, other valuation methods will become unavailable when a partnership owns a lottery prize or other private annuity. Because the law allows more than one method of valuation, in the Estate's estimation, it would be error to reach a conclusion that forces the use of only one method.

We disagree with the Estate's characterization of the valuation methods as mutually exclusive in application. The value of the partnership's assets is but one component in the valuation analysis. As illustrated in Dunn v. Commissioner, 301 F.3d 339 (5th Cir. 2002), valuation of a closely-held business interest may involve a balance between income-based and asset-based valuation, depending on what feature of the interest best reflects its desirability to a willing buyer, its assets or the income stream it produces. Stated another way, valuation of an entity's assets need not be the end of the

---

[5] The stipulation frames the issue as follows:

1. The only disputed issue in this case is whether 19 annual lottery installment payments to be paid by the Texas Lottery Commission must be valued as a private annuity under the valuation tables provided in Treas Reg. § 20.2031-7 and 26 U.S.C. § 7520 ("the annuity tables") in valuing the petitioner's interest in MG Partners, Ltd. This statement of the issue does not imply discounts related to the fact that the right to the lottery payments was held by MG Partners, Ltd., a limited partnership, are in dispute. Partnership-related discounts are taken into account in the agreed-upon alternative values set forth in ¶ 2 below.

2. That parties agree that the value of the petitioner's interest in MG Partners, Ltd. will be the amount set forth in (a) or (b) below, depending on the final judicial decision of the disputed issue described in ¶ 1 above:
(a) If the final judicial determination is that the annuity tables must be applied, the value of the petitioner's interest in MG Partners, Ltd. will be $2,908,605.00.
(b) If the final judicial determination is that the annuity tables are not required to be applied in valuing the 19 lottery payments, the value of the petitioner's interest in MG Partners, Ltd. will be $2,237,140.00.

valuation process. There was indeed a value assigned to the company's assets in <u>Dunn</u>, although in that case we determined that the asset-based value was secondary to the income-based value in accurately capturing the value of the entity. <u>Dunn</u>, 301 F.3d 339, 357 (assigning weights of 85% to the value of the company's income stream and 15% to that of its assets). Here, however, the parties have stipulated to alternate values of the partnership interest, depending upon whether the annuity tables apply to the prize or do not apply; therefore, the balance (value of partnership interest) has been agreed upon. Our holding does not mandate application of one method or the other to the partnership; rather, it bears only on the proper method of valuing the lottery prize.

## C. Valuation of the lottery prize

The Internal Revenue Code taxes the "transfer of the taxable estate," 26 U.S.C. § 2001 (a), defined as the value of the gross estate less applicable deductions, 26 U.S.C. § 2051. The gross estate comprises "all property, real or personal, tangible or intangible." 26 U.S.C. § 2031 (a). 26 U.S.C. § 2033 requires inclusion in the gross estate of all property to the extent of the decedent's interest.

Treasury Regulations § 20.2031-1(b) governs valuation generally, providing that "the value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of decedent's death." Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. . . ." <u>Id</u>.

In the case of a private annuity, fair market value is determined not under the general willing-buyer-willing-seller test, but under the method prescribed by 26 U.S.C. § 7520 and the

6

accompanying regulations. In general, the value of a private annuity is determined by a factor composed of an interest rate component and a mortality component. When the annuity is for a term of years rather than an interest for life, the mortality component is equal to the term of years. The interest rate component is determined using a rounded interest rate equal to 120 percent of the Federal midterm rate in effect for the month in which the valuation date falls. 26 U.S.C. § 7520; Treas. Reg. § 20.7520-1(b).

Thus, for the property interests subject to § 7520 and the accompanying regulations, the sometimes wide variation produced by experts' fair market valuation methods gives way to certainty provided by the valuation tables. In enacting § 7520(a)(1) and requiring valuation by the tables, Congress displayed a preference for convenience and certainty over accuracy in the individual case. Bank of California v. United States, 672 F.2d 758, 760 (9th Cir. 1982); Continental Ill. Nat. Bank & Trust Co. v. U.S., 504 F.2d 586 (7th Cir. 1974). These cases recognize that, in the aggregate, error costs will be small. The applicability of the annuity tables is not, however, unassailable. They must be used to value annuities "'unless it is shown that the result is so unrealistic and unreasonable that either some modification in the prescribed method should be made, or complete departure from the method should be taken, and a more reasonable and realistic means of determining value is available.'" O'Reilly v. Commissioner, 973 F.2d 1403, 1407 (8th Cir. 1992)(quoting Weller v. Commissioner, 38 T.C. 790, 803 (1962)). The party challenging applicability of the tables has the substantial burden of demonstrating that the tables produce an unreasonable result. Id. at 1409.

Recently, the Ninth and Second Circuits have, surprisingly enough, dealt with cases in which facts very similar to those before us have arisen. Gribauskas, 2003 WL 22006241; Shackleford v. United States, 262 F.3d 1028 (9th Cir. 2001). In previous cases, courts departed from valuation

7

tables only when individual cases involved facts substantially at variance with factual assumptions underlying the tables. See, e.g., Berzon v. Commissioner, 534 F.2d 528, 532 (2d Cir. 1976)(departure appropriate when income from an investment could be predicted to be zero but actuarial tables assumed a yield of 3.5%); O'Reilly, 973 F.2d at 1406 (very low dividends were historically paid, but tables assumed a substantially higher yield); Froh v. Commissioner, 100 T.C. 1, 5, 1993 WL 1869 (1993) (income stream was expected to be exhausted before expiration of the income term); Estate of Jennings v. Commissioner, 10 T.C. 323, 327 (1948) (decedent's husband, a beneficiary for life, was not expected to live longer than a year from decedent's death); Hanley v. United States, 63 F. Supp 73, 81-82 (Ct. Cl. 1945)(actual interest rate was 3%, but tables assumed rate of 4%).

Now, however, the Second and Ninth Circuits have recognized limits to the policy of standardization and a concurrent breadth in the exception to applicability of actuarial tables. Gribauskas at *1, *3; Shackleford at 1033. Both circuits held that marketability must be considered in valuing the enforceable right to receive a series of cash payments.

*1. Classification of the lottery prize as a private annuity*

The Estate argues that the lottery prize is not a private annuity, and therefore it is not susceptible to valuation under the tables. The Tax Court relied on its previous decision in Gribauskas v. Commissioner, 116 T. C. 142 (2001), rev'd on other grounds, Gribauskas v. Commissioner, 2003 WL 22006241 (2nd Cir. 2003), which addressed at length the same arguments presented by the Estate in this case, in holding that the lottery prize is a private annuity. Section 7520 does not define "annuity," but we find the reasoning of the Tax Court in Gribauskas on this issue persuasive: a lottery prize is within the customary meaning of the term annuity, which is "'An obligation to pay a stated sum, usually monthly or annually, to a stated recipient." Id. (quoting Black's Law Dictionary).

8

Gribauskas considered the characteristics of a non-transferrable lottery prize payable in yearly installments against those of notes receivable, leaseholds, patents, and royalty payments, none of which are valued under actuarial tables and all of which share some characteristics with the lottery prize. The court distinguished the non-annuity assets, however, as having value dependent on market forces that affect the value of the underlying asset or the likelihood of continued payments. In contrast, a private annuity may be defined broadly, as the right to a series of fixed payments independent of market forces. The lottery prize, an unsecured right to a series of fixed payments for a certain term with virtually no risk of default, falls within the definition of a private annuity, valuable under the § 7520 tables.

### 2. Reasonableness of the result produced by the annuity tables

The Estate holds out the three results from valuation experts against the result from the tables as speaking for themselves on the question of reasonableness. The annuity-table valuation of the lottery prize exceeds the lowest expert valuation by $3,982,850, and the highest by $2,504,661. The difference in the numbers is attributable to non-marketability discounts applied by the experts to the lottery prize but not taken into account by the valuation tables. The Tax Court observed that the wide discrepancies between the three expert valuations made "a compelling argument justifying use of the valuation tables," given Congress's policy of standardizing valuation.

The result produced by the valuation tables is not unreasonable because the factor accounting for the disparity between the expert and the table valuation, i.e., a marketability discount, is not properly applied to the lottery prize. The non-marketability of a private annuity is an assumption

9

underlying the annuity tables.[6]  For example, the value of survivor annuities payable under qualified

plans (transfer of which is prohibited by ERISA); charitable remainder annuity trusts; and grantor

retained annuity trusts (GRATS); which are not marketable, are determined by use of the tables.  See,

Treas. Reg. § 1.664-2(c); 20.2039-2(c)(1)(viii) and (c)(2).  As discussed above, the cases in which

courts have seen fit to depart from the valuation tables have involved facts that disproved

assumptions underlying the tables.  The holdings in Shackleford and Gribauskas depart from that

longstanding trend based on the premise that the right to alienate is fundamental to the valuation of

any property.[7]  Gribauskas at *2; Shackleford, 262 F.3d at 1032 ("The right to transfer is 'one of the

most essential sticks in the bundle of rights that are commonly characterized as property.')(quoting

Youpee v. Babbitt, 67 F.3d 194, 197 (9th Cir. 1995), aff'd, Babbitt v. Youpee, 519 U.S. 234, 117

S. Ct. 727, 136 L. Ed.2d 696 (1997)).  We agree that the right to alienate is necessary to value a

capital asset; however, we think it unreasonable to apply a non-marketability discount when the asset

to be valued is the right, independent of market forces, to receive a certain amount of money annually

for a certain term.  Youpee involved restrictions on the right to devise land, a capital asset.  The

remaining cases relied upon by the Ninth Circuit also involved capital assets, such as corporate stock,

for which value is not readily ascertainable absent a transfer from buyer to seller.  See Mailloux v.

Comm'r, 320 F.2d 60, 62 (5th Cir. 1963)(alienability restrictions reduce value of highly speculative

_____

[6] The Estate argues that an assumption of marketability underlies the tables in that the interest rate component is based on "marketable obligations of the federal government."  The interest rate earned by marketable obligations of the federal government is used to determine the discount to present value; it does not indicate an assumption that the asset being valued under the table is itself marketable.

[7]  As explained hereafter, therein lies the error of the Second and Ninth Circuits and the dissent which relies upon those decisions.

stock); <u>Bayley v. Comm'r</u>, 624 F.2d 884, 885 (9th Cir. 1980) (holding that stock transfer restrictions affect valuation); <u>Trust Services of Am., Inc. v. United States</u>, 885 F. 2d 561, 569 (9th Cir. 1989) (discount may be necessary to accurately value stock subject to resale restrictions); <u>Estate of Jung v. Comm'r</u>, 101 T.C. 412, 434 (1993) (marketability discount applied to minority shares in closely held corporations to reflect hypothetical buyer's concern that there will not be a ready market); <u>Theophilos v. Comm'r</u>, 85 F.3d 440, (9th Cir. 1996) (lack of control discount for minority shares).

The Second Circuit recognized that previous cases departing from the tables involved not simply a disparit y in numbers but factual assumptions in the tables that were inconsistent with the facts of an individual case. <u>Gribauskas</u> at *3. The court reasoned that the exception recognized by previous cases is broader than the Commissioner suggests, as evidenced by the standard of an "unreasonable and unrealistic result." <u>Id</u>. While an extraordinary case whose facts are not duplicative of previous cases might justify departure, the exception is not so broad as to include a case involving a factor not necessary to determine the asset's value. We not e that the Second Circuit relied in <u>Gribauskas</u> on the parties' stipulations that the non-marketability of the lottery prize reduced its value. <u>Id.</u> at *1 ("Notably, the parties stipulated that a market for the Lotto winnings <u>did exist</u> at the time the return was filed [and] that the prize's market value was diminished considerably due to transfer restrictions . . . ."). In the case at bar, the parties stipulated that <u>no market existed</u> for the lottery prize.

Marketability is important to the valuation of an asset when capital appreciation is an element of value or when the value would otherwise be difficult to ascertain. Other kinds of private annuities

are valued under the tables despite being non-marketable.[8]  As the Tax Court stated, non-marketability does not "alter or jeopardize the essential entitlement to a stream of fixed payments."  The value of the lottery prize is readily ascertainable by simple aggregation of the payments to be received.  The value of the prize must be discounted because it is payable over time, rather than in a lump sum; the tables account for that feature by discounting the payments to present value.  We disagree with the Second and Ninth Circuits that a reasonable valuation of the lottery prize requires a discount for non-marketability.  The Tax Court was correct in holding that departure from the annuity tables is not warranted for valuation of the lottery prize.

### CONCLUSION

We find no error in the Tax Court's construction of the stipulations.  The stipulations provided alternate values for the value of the partnership, thus leaving only the question of the lottery prize's valuation.  We conclude that the lottery prize is a private annuity, and the value produced under the valuation tables is not so unreasonable or unrealistic as to warrant resort to a different valuation method.  We affirm the judgment of the Tax Court holding that the prize must be valued under the tables.

AFFIRMED.

---

[8] For example, survivor annuities payable under qualified plans, the transfer of which is prohibited by ERISA. Treas. Reg. § 26 CFR § 1.664-2.

W. EUGENE DAVIS, Circuit Judge, dissenting:

For the reasons that follow, I agree with the well-reasoned opinions of the Second and Ninth Circuits and would not create a circuit split on the narrow issue presented in this appeal.

The broad legal principles that control this case are agreed upon. We start from the bedrock premise that property included in a decedent's gross estate is valued at its fair market value; that is, the price at which the property would change hands between a willing buyer and a willing seller. However, 26 U.S.C. § 7520 and related regulations provide, as a general proposition, that the value of a private annuity is determined from a table. This table value is determined by applying a factor composed of an interest rate component and a mortality component. All parties agree, however, that the applicability of the actuarial tables to determine value of a private annuity is subject to an important jurisprudential exception: either the taxpayer or the Commissioner can avoid use of the table value by showing that ". . . the result is so unrealistic and unreasonable that either some modification in the prescribed method should be made, or complete departure from the method should be taken, and a more reasonable and realistic

13

means of determining value is available." **O'Reilly v. Commissioner**, 973 F.2d 1407 (8th Cir. 1992)(quoting **Weller v. Commissioner**, 38 T.C. 790, 803 (1962)). The scope of the exception to the use of the table generated value is the narrow issue presented to us in this appeal.

The **Weller/O'Reilly** test contemplates a comparison between the annuity's value from the table with its value arrived at by an alternate method based on the particular features of the annuity in question. The **O'Reilly** court explained that application of the tables in situations where they do not produce a value that reasonably approximates the fair market value of the gift might well invalidate the regulation. The court concluded:

> More importantly, we conclude that in abandoning the **Weller** principle [and applying the tables in situations where the table does not produce the value that reasonably approximates the fair market value of the gift] the Tax Court uprooted § 25.2512-5 and its tables from their statutory foundation--to determine the fair market value of the property on the date of the gift. We agree with the court in **Green** that the tables should apply unless the facts present a substantial reason for departure. But whenever use of the tables would produce a substantially unrealistic and unreasonable result, and a more reasonable and realistic means of determining value is available, the statute requires, and decades of case law confirm, that the tables may not be used by either the Commissioner or the taxpayer.

**Id.** 973 F.2d at 1408.

This brings us to the point of my disagreement with the majority. The majority reasons that only the factors considered by the table--interest rate and mortality--can be used to establish

14

that the table value is unreasonable. More to the point, the majority agreed with the Commissioner that the annuity's non-marketability can not be considered. I disagree.

The broad language of **O'Reilly** suggests that any fact related to the specific annuity in question that is relevant to its market value can be considered in deciding whether the table value is unjustified and unreasonable. The court stated that "[t]he dominant regulation is § 2512-1, which provides that value 'is the price at which such property would change hands between a willing buyer and a willing seller.' " **Id.** at 1407 (quoting Treas.Reg. § 25-2512-1). The court then concluded by emphasizing that the "valuation of property interests for tax purposes is 'ever one of fact and not of formula.' Thus we must look at more than the language of the regulation to resolve this question." **Id.** (quoting **Hamm v. Commissioner**, 325 F.2d 934, 938 (8th Cir. 1963), *cert. denied*, 377 U.S. 993 (1964).

The majority declines to follow the circuit courts which have written on the precise question presented here: whether statutory anti-assignment restrictions on lottery payments justify departure from the annuity tables when determining the asset's value. **See Shackleford v. U.S.**, 262 F.3d 1028 (9th Cir. 2001), and **Gribauskas v. Commissioner**, 324 F.3d 85 (2d Cir. 2003). Both cases are indistinguishable from the case at hand.

In **Shackleford**, the winner of the lottery prize died after

15

collecting three of twenty $508,000 annual payments.  California

law, like Texas law, prohibited assignment of lottery payments.

The question was whether the trial court erred in considering the

annuity's non-marketability in departing from the annuity tables.

The court laid out the governing rules as follows:

> Non-commercial annuities, such as the lottery payments at
> issue, are valued pursuant to tables promulgated by the
> Secretary of the Treasury except when another regulatory
> provision applies.  26 U.S.C. § 7520.
>
> . . . although the general rule requires that the tables
> be used because they provide both certainty and
> convenience when applied in large numbers of cases . . .
> exceptions have been made when the tables do not
> reasonably approximate the fair market value of the
> asset.

262 F.3d at 1031-1032 (citations omitted).

The court then explained why it accepted the district court's

conclusion that the discount tables did not reasonably approximate

the fair market value of the lottery payments because of

California's statutory anti-assignment restriction:

> Indeed, the reality of a decedent's economic interest in
> any particular property right is a major factor in
> determining valuation for estate tax purposes.  Each of
> the characteristics of a property interest must be
> considered in determining its value for taxing purposes.
> The right to transfer is "one of the most essential
> sticks in the bundle of rights that are commonly
> characterized as property."  It is axiomatic that if an
> asset's marketability is restricted, it is less valuable
> than an identical marketable asset. We have long
> recognized that restrictions on alienability reduce
> value.

**Id.** at 1032 (citations omitted).

In **Gribauskas,** the Second Circuit considered whether the Tax

16

Court committed error in applying the actuarial tables and in refusing to consider the non-marketability of the lottery prize. The Second Circuit, speaking through Judge Van Graafeiland, concluded that the Tax Court erred as a matter of law in concluding that marketability restrictions did not justify departure from the tables. The Court reasoned that in determining fair market value "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case. 26 C.F.R. § 20.2031-1(b)." 324 F.3d at 87. The Commissioner argued, as he does in this case, that "despite the broad language in departure cases such as **O'Reilly,** departures from the tables are appropriate only when the proponent of departure can show a substantial inconsistency between the actual facts and the assumptions underlying the tables, e.g. when the rate of return is actually lower than the assumed rate of return in the tables, or when the death of the measuring life is eminent due to terminal illness." **Id.** at 88. The court rejected that argument and concluded that "[t]he governing principle is that a departure is allowed if the table produces a substantially unrealistic and unreasonable result." **Id.** at 89.

I would follow the well-reasoned decisions of the 2nd and 9th Circuits' holding that in arriving at an alternate fair market value to compare with the table value a court can consider non-marketability or any other legitimate factor that affects the fair

17

market value of the annuity.  Those courts properly, I think, focused on comparing the results of two computations: the annuity's value under the table and its value under any alternate method designed to show fair market value.

The lottery annuity in this case is non-marketable by statute. Even the Commissioner's expert asserts that its market value is reduced by over two million dollars because of its non-marketability.  In computing an alternate value to compare to the table value, the better rule, as recognized by the 2nd and 9th Circuits, is to consider any factor that affects the annuity's fair market value, including its non-marketability.  Otherwise, other factors that affect fair market value just as much as interest rate and mortality must be arbitrarily disregarded.  For example, under the Commissioner's theory, the near insolvency of the obligor on the annuity could not be considered in arriving at its value.  For these reasons, I respectfully dissent.