REVISED APRIL 15, 2008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 4, 2008

Charles R. Fulbruge III
Clerk

No. 07-30089

TINCY ANTHONY, Administratrix of the Succession of
James Louis Bankston, Sr.

                                   Plaintiff-Appellant

v.

UNITED STATES OF AMERICA

                                   Defendant-Appellee

Appeal from the United States District Court
for the Middle District of Louisiana

Before BARKSDALE, DENNIS, and SOUTHWICK, Circuit Judges.

SOUTHWICK, Circuit Judge:

A decedent's administratrix seeks our reversal of the district court's conclusion that a non-transferrable private annuity must be valued, for estate tax purposes, in accordance with certain tables set out in the Internal Revenue Code. Because we conclude that this case presents no applicable exception to valuation of the relevant annuities by use of the tables, we affirm.

## I. FACTS AND PROCEEDINGS

James Louis Bankston, Sr., sustained serious injuries in an automobile accident in 1990. He filed suit seeking damages from various defendants. In May 1991, Bankston agreed to a structured settlement of his claims and thereby

became the beneficiary of three annuities. The annuities were owned by three separate insurance companies. Each annuity guaranteed monthly or annual payments for a period of at least fifteen years.[1] The payments due under two of the annuities could not be "anticipated, sold, assigned or encumbered." The third annuity provided that payments were "non-assignable." The prohibitions on assignment form the foundation for the arguments made by the taxpayer.

Bankston died on July 30, 1996. At the time of his death, Bankston was scheduled to receive ten additional annual payments from one annuity and monthly payments until July 2006 from the other two. Bankston's estate ("the Estate") initially estimated the present value of Bankston's right to the guaranteed payments to be $2,371,409, using the tables prescribed by 26 U.S.C. § 7520 and the accompanying regulations (the "annuity tables" or "Section 7520 tables"). In April 1997, the Estate reported a tax liability on the annuities in the amount of $468,078. An audit by the Internal Revenue Service resulted in an additional tax of $142,605. The Estate paid its total tax liability ($610,683) plus interest in monthly installments between May 1997 and March 2001.

In September 2001, the Estate claimed that it had overvalued the annuities in its initial filing and was due a refund of estate taxes in the amount of $427,620 plus interest.[2] According to the Estate, the annuities should have been assigned their "fair market value" without regard to the annuity tables

---

[1] The Transamerica annuity (owned by Transamerica Occidental Life Insurance Company) guaranteed Bankston fifteen annual lump sum payments, ranging from $25,000 in 1992 to $150,000 in 2006. The MetLife annuity (owned by MetLife Security Insurance Company) guaranteed Bankston monthly payments for fifteen years and life thereafter, beginning with $9,350 in July 1991 and increasing three percent annually. The Jamestown annuity (owned by Jamestown Life Insurance Company) guaranteed Bankston monthly payments for fifteen years and life thereafter, beginning with $7,000 in July 1991 and increasing 3 percent annually.

[2] The Estate estimated that the fair market value of the annuities at the time of Bankston's death was $1,198,900, not the $2,371,409 figure provided under the annuity tables.

because the non-transferability clauses rendered the annuities subject to a restriction under 26 C.F.R. § 20.7520-3(b)(1)(ii).  The IRS denied the claim.

The Estate filed suit against the United States in March 2002.  Both parties moved for partial summary judgment on the issue of the proper method of valuation for the annuities.  The district court ruled in favor of the government, finding that the prohibitions on assignment of the annuities did not justify a departure from the tables. The district court also found that the result produced by the annuity tables was not unreasonable or unrealistic.  Therefore, the district court found that the annuities were properly valued under the tables and no tax refund was due.  The Estate appealed.

## II.  DISCUSSION

While the mathematical computation of fair market value is an issue of fact, determination of the proper valuation method under the Internal Revenue Code is a question of law that this Court reviews de novo.  Estate of Dunn v. Comm'r, 301 F.3d 339, 348 (5th Cir. 2002).  We also review the district court's interpretation of a regulation de novo, applying the rules of statutory construction.  Lara v. Cinemark USA, Inc., 207 F.3d 783, 786-87 (5th Cir. 2000).

A.    The "Restricted Beneficial Interest" Exception to the Annuity Tables: Treasury Regulation § 20.7520-3(b)

1.  General Estate Tax Principles

The United States imposes a tax on the taxable portions of the estates of all decedents who are citizens or residents.  26 U.S.C. § 2001.  A decedent's estate is composed of "all property, real or personal, tangible or intangible."  26 U.S.C. § 2031(a).  Private annuities, like those payable to Bankston, fall within this definition of a taxable estate.  See Treas. Reg. § 20.2039-1(b)(1)(I).

Treasury regulations provide that "the value of every item of property includible in a decedent's gross estate . . . is its fair market value at the time of the decedent's death."  Treas. Reg. § 20.2031-1(b).  Fair market value is defined

as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Id. The fair market value of an annuity is generally determined by resort to annuity tables prescribed by the IRS. See 26 U.S.C. § 7520(a); Treas. Reg. § 20.7520-1. These tables provide a factor composed of an interest rate component and a mortality component that is used to determine the present value of an annuity. Treas. Reg. § 20.7520-1.

This Court has recognized that "[i]n enacting § 7520(a)(1) and requiring valuation by the tables, Congress displayed a preference for convenience and certainty over accuracy in the individual case." Cook v. Comm'r, 349 F.3d 850, 854 (5th Cir. 2003). While the tables inevitably lead to departures from true value, whatever that might be, the error costs are perceived as small in the aggregate. Id. The tables provide some measure of certainty and administrative convenience that would be disrupted if every attempt to value an annuity deteriorated into a battle of experts regarding market value.

However, there are limited situations in which the values determined by application of the annuity tables need not be used. When the tables result in a value that is unrealistic and unreasonable, other valuation methods should be employed. See Cook, 349 F.3d at 855 (citing O'Reilly v. Comm'r, 973 F.2d 1403, 1407 (8th Cir. 1992)). This case-law exception to the tables has existed for some time. See Weller v. Comm'r, 38 T.C. 790, 802 (1962). Effective with estates of decedents who died after December 13, 1995, the Treasury Department promulgated regulations that provide an explicit exception to the tables for "restricted beneficial interests." Treas. Reg. § 20.7520-3(b)(ii) & (c).

The regulations define a "restricted beneficial interest" as "an annuity, income remainder, or reversionary interest that is subject to any contingency, power, or other restriction, whether the restriction is provided for by the terms of the trust, will, or other governing instrument or is caused by other

4

circumstances." Treas. Reg. § 20.7520-3(b)(ii). Generally, a restricted beneficial interest should be assigned its fair market value without regard to the annuity tables. Treas. Reg. § 20.7520-3(b)(ii) & (iii).[3] In Cook, this Court analyzed the case law exception to the tables, not this regulation. We have yet to interpret or apply the regulatory "restricted beneficial interest" exception.

To understand this regulation and its application, we look first at the law applicable to estates that were not subject to the regulation, then seek to determine the change, if any, that the regulation wrought.

2. The Law for Estates with pre-December 14, 1995, Valuations

This Court in 2003 addressed the proper method for valuing an estate's interest in non-transferable lottery payments; the right to the payments was determined to be a private annuity that could be valued under the tables. Cook, 349 F.3d at 855. The death of the Cook decedent occurred prior to the 1995 effective date of the regulation that we will later analyze.

The Cook estate argued that the annuity tables did not account for the lowered present value of the right to these payments caused by marketability restrictions; thus, departure from the tables was necessary to avoid an unreasonable result. Id. at 855-57. The annuity-table valuation of the right to the payments exceeded by almost four million dollars the lowest valuation by an expert, and exceeded the highest by over two and a half million dollars. The court found that the disparity between the value reached under the tables and the valuation by experts was attributable to a reason that was irrelevant to the valuation, namely, the non-marketability of the right to receive the lottery payments. Id. at 856. Therefore, Cook held that departure from the tables was

_____

[3] The regulations note that a "special" Section 7520 annuity factor may be used to value a restricted beneficial interest in some circumstances. Treas. Reg. § 20.7520-3(b)(ii). Under those circumstances, a party may request a special annuity factor from the IRS. Id. The "special" annuity factor is not an issue in this case.

not necessary because "the non-marketability of a private annuity is an assumption underlying the annuity tables." Id.

> Marketability is important to the valuation of an asset when capital appreciation is an element of value or when the value would otherwise be difficult to ascertain. Other kinds of private annuities are valued under the tables despite being non-marketable. . . . [N]on-marketability does not alter or jeopardize the essential entitlement to a stream of fixed payments.

Id. at 857 (citations and quotation marks omitted). Cook analyzed two other circuits' precedents that recognized a non-marketability exception to the annuity tables, then rejected their rationale and holdings. Id. at 855-57 (citing Estate of Gribauskas v. Comm'r, 342 F.3d 85 (2d Cir. 2003); Shackleford v. United States, 262 F.3d 1028 (9th Cir. 2001)).

Cook is important here for two reasons.[4] First, the opinion is this Circuit's definitive interpretation of the law governing departure from the annuity tables as it existed prior to December 13, 1995, the effective date of Section 20.7520-3(b). As Cook noted, courts had departed from the valuation tables under the "unrealistic and unreasonable" standard "only when individual cases involved facts substantially at variance with factual assumptions underlying the tables." 349 F.3d at 854-55. Even courts that have recognized a non-marketability exception to the tables agree with Cook's interpretation of prior case law. See e.g., Gribauskas, 342 F.3d at 88 ("The Commissioner is correct in characterizing the case law up to this point – excluding, of course, Shackleford – as authorizing

---

[4] The Estate suggests that Cook is distinguishable from the present case because the Cook annuitant was also the owner of the annuity. Cook, 349 F.3d at 851-52. In the present case, other entities owned the Bankston annuities. We do not find this to be a significant distinction. The interest to be valued is the right to receive payments from an annuity, regardless of who owns the annuity. See Treas. Reg. § 20.2039-1. Both here and in Cook, the interest rendered non-transferable by agreement (be it a true ownership interest or merely a contractual right to receive payments) would otherwise be transferable. See 29 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 74.10 (4th ed. 2000) ("Generally, all contract rights may be assigned in the absence of clear language expressly prohibiting the assignment . . . .").

departures only when the actual facts are inconsistent with the assumptions underlying the tables."). Prior to Shackleford and Gribauskas, the "unrealistic and unreasonable" exception was a narrow one. Its application was confined to a limited set of circumstances, such as cases where the actual rate of return was lower than the assumed rate of return in the tables, the death of the measuring life was imminent due to a terminal illness, or the income stream would be exhausted before expiration of the income term. Cook, 349 F.3d at 855; Gribauskas, 342 F.3d at 88.

Second, Cook presented this Court with an opportunity to recognize a new, non-marketability exception to the annuity tables. Such an extension of the law was rejected. Cook found the Second and Ninth Circuits' rationale unpersuasive in the context of valuing a private annuity:

> We agree that the right to alienate is necessary to value a capital asset; however, we think it unreasonable to apply a non-marketability discount when the asset to be valued is the right, independent of market forces, to receive a certain amount of money annually for a certain term.

Cook, 349 F.3d at 856. The Court refused to depart from the "longstanding trend" of requiring valuation under the tables unless a case involved facts that disproved assumptions underlying those tables. Id.

3. Treasury Regulation § 20.7520-3(b)

In its brief, the Estate concedes that Cook addressed a nearly identical issue of law as presented in this appeal. However, it argues that this appeal is governed by the "restricted beneficial interest" exception to the Section 7520 tables – an exception that was not considered in Cook because it was not in effect as to Cook's estate. The Estate argues that all estates with a valuation date after December 13, 1995, are governed by the language of Section 20.7520-3(b)(1)(ii), which precludes the use of annuity tables in valuing a "restricted beneficial interest," that is "an annuity . . . that is subject to any contingency,

power, or other restriction . . . ." The Estate would have us read the term "other restriction" broadly, to create an exception to the tables based on the type of marketability restrictions placed on Bankston's annuity interest.

The Estate is correct that Cook did not, indeed, could not properly consider Section 20.7520-3(b). Accordingly, we should re-evaluate the issue discussed in Cook in light of the later regulation. We now turn to that analysis.

### a. Regulation's Language and Structure

We interpret regulations in the same manner as statutes, looking first to the regulation's plain language. Lara, 207 F.3d at 787. Where the language is unambiguous, we do not look beyond the plain wording of the regulation to determine meaning. Copeland v. Comm'r, 290 F.3d 326, 332-33 (5th Cir. 2002). A "regulation should be interpreted in a manner that effectuates its central purposes." Jochum v. Pico Credit Corp. of Westbank, Inc., 730 F.2d 1041, 1047 (5th Cir. 1984). Further, "courts should not interpret an agency regulation to thwart the statutory mandate it was designed to implement." Id.

The language of Section 20.7520-3(b)(1)(ii) is broad: "[a] restricted beneficial interest is an annuity, income, remainder, or reversionary interest that is subject to any contingency, power, or other restriction, whether the restriction is provided for by the terms of the trust, will, or other governing instrument or is caused by other circumstances." In effect, the Estate asks this Court to begin and end our analysis of Section 20.7520-3(b)(1)(ii) by reading only three words of the regulation – "any . . . other restriction." As we will explain, we find more to be required, namely, a consideration of the regulation as a whole and interpreting that phrase in context. Lara, 207 F.3d at 787; see Malacara v. Garber, 353 F.3d 393, 400 (5th Cir. 2003).

First, we note that the "other restriction" language follows two specific types of restrictions, a "contingency" and a "power." Both are restrictions that might undermine the fundamental assumptions supporting the valuation of an

"ordinary beneficial interest" under the tables. See Treas. Reg. § 20.7520-3(b)(1)(i).[5] For example, the right to receive annuity payments may be contingent on the survival of a person who is terminally ill. See Treas. Reg. § 20.7520-3(b)(4) (Example 1); Estate of Jennings v. Comm'r, 10 T.C. 323 (1948). Or a trustee may exercise a power to invade the corpus and, thereby, exhaust or diminish the income stream. See Treas. Reg. § 20.7520-3(b)(2)(v) (Example 4); Froh v. Comm'r, 100 T.C. 1 (1993). These restrictions, unlike the one on assignability with which we are concerned in this appeal, threaten to end an annuitant's right to receive any future payments.

Next, the structure of the regulation also suggests a narrow definition of "other restriction." Subparagraph (ii) of Section 20.7520-3(b)(1) defines "restricted beneficial interest." However, subparagraph (iii) does not repeat the term "restricted beneficial interest" but instructs the taxpayer that "[i]f, under the provisions of this paragraph (b), the interest rate and mortality components prescribed under section 7520 are not applicable in determining the value of any annuity . . . the actual fair market value of the interest (determined without regard to section 7520) is based on all of the facts and circumstances . . . ." Treas. Reg. § 20.7520-3(b)(1)(iii) (emphasis added). Again, emphasis is placed on the two assumptions underlying the tables, not more broadly on any factor that might affect the value.

A reading of the entirety of Section 20.7520-3(b) discloses an emphasis on the fundamental assumptions – the interest rate and mortality components – when determining whether departure from the tables is warranted. Subparagraph (2) is replete with illustrations of circumstances under which its

---

[5] A "contingency" is defined as "[a]n event that may or may not occur; a possibility" or "[t]he condition of being dependent on chance; uncertainty." BLACK'S LAW DICTIONARY 338 (8th ed. 2004). A "power" is defined as "[t]he legal right or authorization to act or not act; a person's or organization's ability to alter, by an act of will, the rights, duties, liabilities, or other legal relations either of that person or of another." BLACK'S LAW DICTIONARY 1207 (8th ed. 2004).

exceptions are applicable. The regulation explains that a standard Section 7520 annuity factor should not be used where an annuity is expected to exhaust the fund before the last possible payment is made (Treas. Reg. § 20.7520-3(b)(2)(i)), where the trust corpus may be invaded without the beneficiary's consent (Treas. Reg. § 20.7520-3(b)(2)(ii)), or where an individual who is a measuring life is terminally ill (Treas. Reg. § 20.7520-3(b)(3)). In addition, the regulation provides examples of its applications. These are examples in which either the interest rate or mortality component is inapplicable, or the corpus that funds the payments is subject to diversion or exhaustion. See Treas. Reg. § 20.7520-3(b)(2)(v), (b)(4). The regulation offers no examples of "marketability" or "transferability" restrictions.

### b. Regulation's Promulgation

We also find it useful to examine Treasury Decision 8630 ("T.D. 8630"), which accompanied the final publication of Section 20.7520-3(b). See 60 Fed. Reg. 63913 (Dec. 13, 1995). T.D. 8630 summarizes the new regulation as being "necessary in order to provide guidance consistent with court decisions concluding that the valuation tables are not to be used in certain situations." 60 Fed. Reg. at 63913 (emphasis added). In response to comments regarding the application of the tables, T.D. 8630 states that "these regulations generally adopt principles established in case law and published IRS positions." 60 Fed. Reg. at 63914. The only comments to which T.D. 8630 responded concerned exhaustion or underfunding of the trust corpus or a terminally ill measuring life. 60 Fed. Reg. at 63913-14.

Like the regulation itself, T.D. 8630 makes no mention of marketability or transferability restrictions and provides no examples that would invoke such restrictions. The Estate directs our attention to T.D. 8630's declaration that "the tables cannot be used if the instrument of transfer does not provide the beneficiary of the annuity, income interest, or remainder interest with the

degree of beneficial enjoyment that is consistent with the traditional character of that property interest under applicable local law." 60 Fed. Reg. at 63913. The Estate argues that the right to market or alienate a private annuity is essential to the beneficial enjoyment of such an interest. Perhaps to show that marketability of such annuities is traditional and not aberrational, counsel for the Estate at oral argument asserted that marketing of structured settlement rights is so common that the value can be easily determined.

It is true that the "beneficial enjoyment" language on which the Estate relies appears in the regulation itself. See Treas. Reg. § 20.7520-3(b)(2)(ii)(A). However, the final regulation elaborates on T.D. 8630's language, stating that "beneficial enjoyment is provided only if it was the transferor's intent, as manifested by the provisions of the governing instrument and the surrounding circumstances, that the trust provide an income interest for the income beneficiary during the specified period of time that is consistent with the value of the trust corpus and with its preservation." Treas. Reg. § 20.7520-3(b)(2)(ii)(A). Consistently with what we have already said about the regulation, this language emphasizes preservation of the trust corpus. This comports with Cook's recognition that an annuity, unlike many other assets, grants the beneficiary the "right, independent of market forces, to receive a certain amount of money annually for a certain term." Cook, 349 F.3d at 856 (emphasis added). We find that "beneficial enjoyment," in the context of an annuity, refers to the ability of the corpus to support the periodic payments, not to the ability of the annuitant to transfer his interest in those payments.[6]

### 4. Summary of regulation

---

[6] The Estate argues it was error for the district court to cite two Technical Advice Memorandums ("TAMs") issued by the IRS; the lower court stated, though, that the TAMs had no precedential value. See 26 U.S.C. § 6110(k)(3). We do not rely on these TAMs.

By promulgating Section 20.7520-3(b), the Treasury Department formalized existing case-law exceptions that applied to valuation under the annuity tables – exceptions that were only applicable in cases that presented "facts that disproved assumptions underlying the tables." Cook, 349 F.3d at 856. Cook concluded that the "non-marketability of a private annuity is an assumption underlying the annuity tables." Id. Thus, the marketability restrictions on the Estate's annuities do not disprove a relevant assumption. We do not find the post-December 1995 regulation to be a basis on which to reject the Cook conclusion about non-marketability and the tables, which is the law in this Circuit. We continue to hold that the Tax Court was correct when it stated that "the intent of this provision [in Section 20.7520-3(b)] was to formalize the existing case law regarding the validity of the tabular assumptions in situations where facts show a clear risk that the payee will not receive the anticipated return." Estate of Gribauskas v. Comm'r, 116 T.C. 142, 164 (2001), rev'd, 342 F.3d 85 (2d Cir. 2003).[7] That risk does not arise in the facts before us today.

Requiring valuation of non-marketable annuities under the tables, absent "facts substantially at variance with factual assumptions underlying the tables," respects Congress's "preference for convenience and certainty over accuracy in the individual case." Cook, 349 F.3d at 854-55. As the Tax Court noted:

> the enactment of a statutory mandate in section 7520 reflects a strong policy in favor of standardized actuarial valuation of these interests which would be largely vitiated by the estate's advocated approach. A necessity to probe in each instance the nuances of a payee's contractual rights, when those rights neither alter or jeopardize the essential entitlement to a stream of fixed payments, would unjustifiably weaken the law.

---

[7] The Second Circuit's reversal of the Tax Court came as the result of that Circuit's expansion of the law under the "unrealistic and unreasonable" standard. Gribauskas, 342 F.3d at 88. The Second Circuit did not interpret Section 20.7520-3(b) and did not criticize the Tax Court's interpretation of that regulation. Id. We find the Tax Court's interpretation of Section 20.7520-3(b) persuasive.

Gribauskas, 116 T.C. at 163-64.

The Estate at oral argument asserted that there exists a market for structured settlement annuities, a market that it alleges is as predictable and more accurate than the Section 7520 tables. Regardless of the precise details, we accept that there is a market-recognized and discounted value to the right to transfer an income stream. There certainly are individuals who will wish to sell at a discounted price their inherited right to receive a guaranteed amount of money that is paid out over a term of years. What Cook held and what we conclude was unchanged by anything relevant since Cook, is that for tax purposes, the annuity tables are not concerned about the difference in market value between an inherited, non-transferable right to receive periodic payments of this sort and an inherited, transferable right to receive such payments. Only if the successor to the decedent desires to assign the annuity is there a practical difference to what that successor has received. Though markets value assignable and non-assignable annuities differently, we continue to conclude that for purposes of Section 7520, the Tax Code does not.

As interpreted in Cook, Section 7520 demonstrates Congress's intent that current tables govern the valuation of annuities unless the factual assumptions underlying those tables are disproved. Those assumptions hold in this case.

In light of its language, structure, and purpose, we do not read Section 20.7520-3(b) so broadly as to require a non-marketability exception from the annuity tables. To the extent the Estate argues that, notwithstanding Cook, the language of Section 20.7520-3(b) is broad enough to permit this Court to adopt a non-marketability exception, we decline to do so. This exception was rejected by Cook. The principles that guided Cook also guide us even with a new regulation as part of the direction given. Instead, we follow the Tax Court's rationale in Gribauskas, endorsed by Cook, that "a restriction within the meaning of the regulation is one which jeopardizes receipt of the payment

stream, not one which merely impacts on the ability of the payee to dispose of his or her right thereto." Gribauskas, 116 T.C. at 165.

We affirm the district court's decision that Bankston's annuities were not "restricted beneficial interests" under Section 20.7520-3(b).

B. Unreasonable and Unrealistic Results

The Estate argues that even if the "restricted beneficial interest" exception does not encompass a non-marketability exception to valuation under the tables, valuation under the tables in this case is still inappropriate because the tables yield an "unreasonable and unrealistic" result. While annuities should generally be valued under the Section 7520 tables, the applicability of the annuity tables is not unassailable. Cook, 349 F.3d at 850. The tables must be used to value annuities "unless it is shown that the result is so unrealistic and unreasonable that either some modification in the prescribed method should be made, or complete departure from the method should be taken, and a more reasonable and realistic means of determining value is available." Id. at 854. Further, "[t]he party challenging applicability of the tables has the substantial burden of demonstrating that the tables produce an unreasonable result." Id. at 854-55.

The district court held that use of the annuity tables did not create an "unrealistic or unreasonable" result even though the table valuation was substantially more than the Estate's purported free market valuation. Here, the Estate has alleged a $1,176,810 disparity (roughly fifty percent less than the value prescribed by the tables).[8] In Cook, valuation of the non-transferable lottery payments under the annuity tables exceeded the highest expert valuation

---

[8] The $1,198,900 alternative valuation figure appears to be derived solely from a "fair market value analysis" offered as an exhibit to the Estate's original refund request. This analysis applies a twenty-five percent discount factor when valuing the annuity interest. It is unclear from the record who prepared the analysis or how the preparer arrived at the discount factor. Neither party offered an expert valuation during proceedings before the district court.

by $2,504,661 (a twenty-nine percent disparity) and the lowest by $3,982,850 (a forty-seven percent disparity). Cook, 349 F.3d at 852 n.2, 856. Yet, this Court refused to depart from the tables. Id. at 856-57. Adherence to the tables in the face of even greater disparities has occurred. E.g., Estate of Donovan v. United States, 2005 WL 958403, **3-5 (D. Mass. April 26, 2005) (unpublished) (finding sixty-six percent disparity was not unreasonable, citing Cook).

More importantly, the Estate relies solely on marketability restrictions to demonstrate a disparity between the alleged fair market value and the value under the tables. This basis for departure under the "unrealistic and unreasonable" standard – for purposes of valuing a private annuity – is foreclosed by Cook. 349 F.3d at 856 ("The result produced by the valuation tables is not unreasonable because the factor accounting for the disparity between the expert and the table valuation, i.e., a marketability discount, is not properly applied to the lottery prize."). Cook refused to depart from the annuity tables despite a significant disparity between the result under the tables and the alleged market value. The refusal was because that disparity arose from the same non-marketability factor that explains the disparity before us today. We continue to follow Cook's lead.

The district court correctly determined that the results yielded by the tables were not "unrealistic and unreasonable" in this case.

AFFIRMED.