**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAMES HALVERSON, as Personal Representative of the fee estate of Jack Halverson,<br><br>*Plaintiff - Appellant*,<br><br>v.<br><br>DOUG BURGUM, Secretary of the Interior,<br><br>*Defendant - Appellee*. | No. 23-3864<br><br>D.C. No.<br>1:22-cv-00076-SPW<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Argued and Submitted December 5, 2024
San Francisco, California

Filed August 21, 2025

Before: Daniel A. Bress and Danielle J. Forrest, Circuit
Judges, and Jinsook Ohta, District Judge.[*]

Opinion by Judge Forrest;
Concurrence by Judge Ohta

---

[*] The Honorable Jinsook Ohta, United States District Judge for the
Southern District of California, sitting by designation.

## SUMMARY[**]

### Sovereign Immunity

The panel (1) vacated the district court's judgment in a mandamus action brought by the Estate of Jack Halverson (Estate) seeking to compel the Secretary of the Interior, acting for the Bureau of Indian Affairs (BIA), to partition land on the Crow Reservation in Montana consistent with a settlement agreement entered into by the Estate and the BIA; and (2) remanded for the district court to dismiss this case for lack of subject matter jurisdiction.

The panel held that sovereign immunity bars federal jurisdiction over this action. Because the Estate seeks to enforce contract rights, the panel concluded that this mandamus suit was brought against the United States and, therefore, is barred absent a clear expression of consent. The Estate does not identify a statute in which the government consents to suit for mandamus actions seeking to enforce contractual rights. Accordingly, the Estate's claim is barred by sovereign immunity.

Concurring, District Judge Ohta joined the majority opinion nearly in full, but respectfully declined to use the term "Indian" to refer to indigenous people in the United States in the aggregate—except when quoting statutes, caselaw, or the like—because it is an imprecise term that is now disfavored by many Native people and organizations.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

John G. Crist (argued), Crist Krogh & Nord PLLC, Billings, Montana, for Plaintiff-Appellant.

Abbie J.N. Czoik (argued), Tim Tatarka, and Mark S. Smith, Assistant United States Attorneys; Jesse A. Laslovich, United States Attorney; Office of the United States Attorney, United States Department of Justice, Billings, Montana; for Defendant-Appellee.

**OPINION**

FORREST, Circuit Judge:

The Estate of Jack Halverson (Estate) seeks to compel the Secretary of the Interior, acting for the Bureau of Indian Affairs (BIA), to partition land on the Crow Reservation in Montana consistent with a settlement agreement entered into by the Estate and the BIA. This action is barred by sovereign immunity because a claim to compel a federal officer to perform a contract is directed at the United States and the United States has not consented to this type of suit. Therefore, we vacate the decision below and remand with directions for the district court to dismiss this case for lack of subject-matter jurisdiction.

## BACKGROUND

### I. Indian[1] Lands

National policy governing management of Indian land has vacillated throughout history. At our Founding, the United States asserted title to these lands. *See generally Johnson v. M'Intosh*, 21 U.S. 543, 592 (1823) ("The absolute ultimate title [of Indian lands] has been considered as acquired [by the United States] by discovery, subject only to the Indian title of occupancy."). In the nineteenth century, through treaties, the Federal Government sought to confine

---

[1] We recognize that there are different terminology preferences for referring to members of the 574 federally recognized tribes in the United States. Some prefer "Indian" and others prefer "Native American," but both are acceptable in legal discourse, academic literature, and social conversation. *See, e.g.*, Elizabeth A. Reese, *The Other American Law*, 73 Stan. L. Rev. 555, 558 n.6 (2021) (using both terms interchangeably "to normalize the common use and presence of both for readers"); Michael Yellow Bird, *What We Want to be Called: Indigenous Peoples' Perspectives on Racial and Ethnic Identity Labels*, 23 Am. Indian Q. 1, 15–16 (1999) (noting a strong preference for identification to reflect tribal affiliation, but noting that survey respondents often preferred "Indian" to "Native American"); *McGirt v. Oklahoma*, 591 U.S. 894, *passim* (2020) (using both terms throughout). With no universal preference established, we use "Indian" in this opinion because it is a legal term of art that is used routinely by courts. *E.g.*, *Haaland v. Brackeen*, 599 U.S. 255, *passim* (2023); *Arizona v. Navajo Nation*, 599 U.S. 555, 574–99 (2023) (Gorsuch, J., dissenting); *Agua Caliente Tribe of Cupeño Indians of Pala Reservation v. Sweeney*, 932 F.3d 1207, 1210 n.2 (9th Cir. 2019) ("For consistency with our caselaw, we use the term "Indian" to refer to Native Americans."). We also note that, as generally used in Title 25, "Indian" is a political—not a racial—classification, referring only to federally recognized tribes and their members. *Morton v. Mancari*, 417 U.S. 535, 553 & n.24 (1974); *United States v. Antelope*, 430 U.S. 641, 646–47 (1977); *see also* 1 Felix Cohen *et al.*, *Cohen's Handbook of Federal Indian Law* § 4.03 (2024). We use the term "Indian" in this same political sense.

tribes to reservations. *See generally* 1 Felix Cohen *et al.*, *Cohen's Handbook of Federal Indian Law* § 2.06 (2024). Near the end of that century, Congress passed the Indian General Allotment Act of 1887, also known as the Dawes Act, which sought to "extinguish tribal sovereignty" by allotting collectively held tribal lands to individual Indians. *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992); *Babbitt v. Youpee*, 519 U.S. 234, 237 (1997); Indian General Allotment Act, Pub. L. No. 49-119, 24 Stat. 388 (1887). One goal of the allotment policy was to assimilate Indians into Anglo-American culture. *See McGirt v. Oklahoma*, 591 U.S. 894, 904 (2020); 1 *Cohen's Handbook* § 2.06. Another was to open Indian lands to white settlement. *See McGirt*, 591 U.S. at 904.

Under the Allotment Act, the United States initially held allotted reservation land in trust for a defined period of years before title passed in fee to the individual Indian allottee. Pub. L. No. 49-119, §§ 5, 6 (codified as amended at 25 U.S.C. §§ 348, 349). If the allottee died during the trust period, the allottee's interest passed to heirs according to state law. *Id.* § 5. Likewise, once fee title passed to the allottee, allotted land became subject to state law. *Id.* § 6. But "as allottees passed their interests on to multiple heirs, ownership of allotments became increasingly fractionated, with some parcels held by dozens of owners." *Youpee*, 519 U.S. at 237; *see also* Jessica A. Shoemaker, *Emulsified Property*, 43 Pepp. L. Rev. 945, 960 (2016) ("The Department of the Interior reported in 2012 that there were 92,000 fractionated tracts of trust lands, and within these fractionated tracts, there were 2.9 million fractional ownership interests.").

Fractionation resulted in "owners of small undivided interests [who] could not make productive use of the[ir] land" and the inefficient and costly administration of Indian lands. *Youpee*, 519 U.S. at 238. The fractionation problem was particularly acute because, among other things, "Indians often died without wills" and the Allotment Act had "alienation restrictions that impeded holders of small interests from transferring those interests." *Id.*

Things changed in 1934 when Congress passed the Indian Reorganization Act, which prohibited further allotment and indefinitely extended the trust period for lands then held in trust by the United States. 25 U.S.C. §§ 5101, 5102. This Act also authorized the BIA to acquire property to hold in trust for tribes or individual Indians, *see id.* §§ 5115, 5108, 5138, and to convert trust land into fee simple upon request by an individual Indian owner. *Id.* § 5134; 25 C.F.R. § 152.4.

The practical result of the management history of Indian land is that a single parcel may consist of both trust and fee land held by numerous interest holders. To address this fractionation, Congress has given the BIA partition authority. Relevant here, the Secretary may partition an "inherited trust allotment" if it is "to the advantage of the heirs" 25 U.S.C. § 378. The BIA interprets § 378 as authorizing only "partition in kind" and only of land held in trust. 25 C.F.R. § 152.33(a). The BIA has also taken the position that if an allotment is held in fee title, it has no authority to accomplish a partition, and instead, a "partition may be accomplished by the heirs executing deeds approved by the Secretary, to the other heirs for their respective portions." *Id.* § 152.33(b).

## II. Halverson's Parcel

Jack Halverson owned a fractional interest in Allotment 1809, a 799.06-acre parcel on the Crow Reservation. In 2015, he applied for a partition under 25 U.S.C. § 378. At that time, Allotment 1809 was held by four tenants in common as follows: 86.42% by the United States in trust for Halverson; 6.79% by the United States in trust for the Crow Tribe; 1.23% by the United States in trust for the Estate of Walking Bear; and 5.56% in fee simple by the Estate of Powers.

Halverson asked the BIA to partition the Allotment into an East parcel of 108.52 acres and a West parcel of 690.54 acres, with Halverson to take sole possession of the West parcel and the other interest holders to take the East parcel. The BIA denied Halverson's petition on grounds unrelated to this appeal, and Halverson filed an administrative appeal. In 2021, after Halverson died, the BIA settled with the Estate. The Joint Notice of Settlement (Settlement Agreement) submitted to the Administrative Law Judge (ALJ) stated that Halverson's partition application was "approved and granted" and that all documents necessary to complete the partition would be prepared and recorded.

The BIA followed through on partitioning Allotment 1809 into an East and West parcel with the respective acreages that Halverson requested, but the Estate contends that the BIA did not properly assign the respective ownership interests as required by the Settlement Agreement. The BIA recorded two deeds. The first one transferred Halverson's interest in the East parcel to the United States, to be held in trust for the Walking Bear Estate and the Crow Tribe. The second one transferred both the Tribe's and Walking Bear Estate's interest in the West

Parcel to the United States, to be held in trust for the Estate. But neither transfer addressed the Estate of Powers' fee interest in both the East and West parcels, consistent with the limitations in 25 C.F.R. § 152.33(b). The result was that the Estate had only a 94.44% interest in the West parcel as a tenant in common with the Estate of Powers, which had the remainder 5.56% interest. This reduced the Estate's land interest by roughly 40 acres.[2]

The ALJ denied the Estate's motion to compel the BIA to comply with the Settlement Agreement. The Estate then filed this mandamus action to compel the BIA to partition Allotment 1809 as the parties had agreed. The district court granted summary judgment for the BIA, concluding that it had fully performed the Settlement Agreement. *Halverson v. Haaland*, No. 22-76-BLG-SPW, 2023 WL 3742323, at *4–6 (D. Mont. May 31, 2023); *Halverson v. Haaland*, No. 22-76-BLG-SPW, 2023 WL 7128523, at *4 (D. Mont. Oct. 30, 2023). The Estate timely appealed.

## DISCUSSION

The Government argues that sovereign immunity bars this action because it is brought against the United States, which has not waived its sovereign immunity for claims seeking specific performance of a contract. Regardless of whether this argument was made to the district court, because federal sovereign immunity is jurisdictional, it may be raised at any point. *Dep't of Treasury v. Fed. Lab. Rels. Auth.*, 521 F.3d 1148, 1152 (9th Cir. 2008). We review

---

[2] The exchanges were for "lands of equal value," meaning that each owner's percent of ownership can easily be converted to an acreage value. Before the partition, the Estate held 86.42% of 799.06 acres, or the equivalent of 690.54 acres. But after the partition, the Estate held 94.44% of 690.54 acres, or the equivalent of 651.87 acres.

whether sovereign immunity applies de novo. *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 765–66 (9th Cir. 2018).

## I.   Claim Against the United States

Our first question in determining whether sovereign immunity applies is whether the claim was filed against the United States. In answering this question, it is immaterial whether a suit directly names the United States as a defendant. The Supreme Court has instructed: "[C]ourts should look to whether the sovereign is the real party in interest to determine whether sovereign immunity bars the suit. In making this assessment, courts may not simply rely on the characterization of the parties in the complaint, but rather must determine in the first instance whether the remedy sought is truly against the sovereign." *Lewis v. Clarke*, 581 U.S. 155, 161–62 (2017) (citation omitted). "The general rule is that a suit is against the sovereign if . . . the effect of the judgment would be 'to restrain *the Government* from acting, *or to compel it to act*.'" *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (emphases added) (citation omitted) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 704 (1949)).

Where a claim alleges that a government official acted outside the bounds of statutory or constitutional authority, the official is the real party in interest, not the United States. *Larson*, 337 U.S. at 698, 701–02; *Dugan*, 372 U.S. at 621–22. But where a claim seeks specific performance on a government contract, the United States is the real party in interest. *Larson*, 337 U.S. at 703. For example, in *Larson*, the plaintiff brought a claim against the head of the War Assets Administration, seeking specific performance on a contract with the Administration for surplus coal that the Administration had also contracted to sell to others. *Id.* at

684. The Court held that the claim was effectively asserted against the United States because the proposed injunction would require ordering the officer to take official action on behalf of the United States. *Id.* at 688–89. Put another way, the "compulsion [was directed] against the sovereign, although nominally directed against the individual officer." *Id.* at 688. This is true even in cases seeking to compel an official's performance of a contract via mandamus. *See United States ex rel. Goldberg v. Daniels*, 231 U.S. 218, 221–22 (1913) (holding that a common law mandamus action to compel the Secretary of the Navy to perform a contract was a suit against the sovereign); *Lee v. Blumenthal*, 588 F.2d 1281, 1282 (9th Cir. 1979) (holding that a mandamus action to compel the Secretary of the Treasury to redeem certain bonds was "an action against the sovereign").

Here, mandamus relief under 28 U.S.C. § 1361 is proper only if the named official owes a "clear nondiscretionary duty" to the plaintiff. *Heckler v. Ringer*, 466 U.S. 602, 616 (1984); *see also Plaskett v. Wormuth*, 18 F.4th 1072, 1081 (9th Cir. 2021) (outlining the mandamus elements). The Estate does not allege any violation of a statutory or constitutional duty by any government official as the basis for its mandamus claim. Nor could it where the relevant statute provides only that the Secretary "*may* cause . . . lands to be partitioned." 25 U.S.C. § 378 (emphasis added). Instead, the Estate alleges that the Secretary owes a nondiscretionary duty stemming from the Settlement Agreement, and it seeks a partition "in accordance with" the Settlement Agreement and supporting documents. Despite the Estate's contention that it is asserting a breach-of-trust claim, at oral argument it confirmed that any duties owed by the BIA are contractual by acknowledging that any breach-

of-trust claim is based on the Secretary's obligations under the Settlement Agreement.

Because the Estate seeks to enforce contract rights, consistent with *Larson*, *Goldberg*, and *Lee*, we conclude that this mandamus suit was brought against the United States and, therefore, is barred absent a clear expression of consent.

## II. Consent

"Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity together with a claim falling within the terms of the waiver." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (citation omitted). "The terms of consent to be sued may not be inferred, but must be 'unequivocally expressed,' in order to 'define [a] court's jurisdiction.'" *Id.* (alteration in original) (citation omitted) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). There is no such waiver of sovereign immunity here.

The Estate does not identify a statute in which the government consents to suit for mandamus actions seeking to enforce contractual rights. While the mandamus statute under which the Estate sought relief confers jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States . . . to perform a duty owed to the plaintiff," 28 U.S.C. § 1361, we have held that this statute does not in and of itself constitute "consent to suit by the sovereign." *Smith v. Grimm*, 534 F.2d 1346, 1352 n.9 (9th Cir. 1976) (citation omitted); *see White v. Adm'r of Gen. Servs. Admin.*, 343 F.2d 444, 447 (9th Cir. 1965) (holding § 1361 did not waive sovereign immunity in a breach-of-contract case seeking equitable relief). Accordingly, we

discern no waiver of sovereign immunity to permit the Estate's claim.**[3]**

## CONCLUSION

Nearly a decade has passed since Jack Halverson applied to partition Allotment 1809 to separate his interest from his co-tenants. And his Estate is justifiably frustrated with how the BIA handled this matter at all stages. But we must faithfully apply the law, and here sovereign immunity bars federal jurisdiction over this action. Therefore, because the district court reached the merits of the Estate's claim, we **VACATE** its decisions, *e.g.*, *United States v. Park Place Assocs.*, 563 F.3d 907, 935 (9th Cir. 2009), and **REMAND** for the case to be dismissed for lack of jurisdiction.

---

OHTA, District Judge, concurring:

I agree with my colleagues' well-reasoned legal analysis and join their opinion nearly in full. I write this brief concurrence only to respectfully decline to use the term "Indian" to refer to indigenous people in the United States in the aggregate, except when quoting statutes, caselaw, or the like. While "Indian" has long been used legally and politically to describe indigenous people from North America, it is an imprecise term that is now disfavored by many Native people and organizations. *See, e.g.,* Bureau of Indian Affairs, *Editorial Guide*, https://www.bia.gov/guide/editorial-guide (last visited Aug.

---

[3] We do not address whether the Administrative Procedure Act, the Tucker Act, or the Indian Tucker Act might provide a waiver of sovereign immunity for a claim challenging the Secretary's actions that seeks different relief than that sought here.

13, 2025) ("use of this term [Indian] alone can be considered derogatory if used to refer to American Indians and Alaska Natives, and it creates confusion between Native American people from India."); Cong. Budget Off., *A Guide to Style and Usage* (Dec. 19, 2013), https://www.cbo.gov/publication/44975 (last visited Aug. 13, 2025) ("Indian: Use only as part of a proper noun, such as the *Indian Health Service.* Otherwise use *Native American*."); U.S. Geological Survey, Office of Science Quality & Integrity, *Tribal-Related Guidance for USGS Authors*, https://www.usgs.gov/office-of-science-quality-and-integrity/tribal-related-guidance-usgs-authors (last updated Sept. 12, 2024) (last visited Aug. 13, 2025) ("the term Native American is generally preferred when speaking broadly of Indigenous persons within the boundaries of the United States… the term American Indian may be appropriate, particularly when it's included in the name of a Tribe or organization.)

I fully acknowledge that indigenous people in America are not a monolith, and that some Native people use the term "Indian."  And of course, the best term is the one the person or tribal community uses to describe themselves.  When referring to indigenous Americans more broadly, however, I believe that using alternatives such as "Native," "Native American," or "American Indian" is both more accurate and appropriate than continuing to use a historical misnomer for the sake of consistency.